UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARTIN SANTIAGO,

                              Plaintiff,
                                                        9:11-CV-635
v.                                                      (LEK/TWD)

PATRICK M. JOHNSON, R.P.A.,
NANCY SMITH, N.A.,

                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:

MARTIN SANTIAGO
Plaintiff *pro se*
03-B-1801
Marcy Correctional Facility
P.O. Box 3600
Marcy, New York 13403

HON. ERIC T. SCHNEIDERMAN              JAMES SEAMAN, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT AND RECOMMENDATION

Plaintiff Martin Santiago, who is presently confined at Marcy Correctional Facility,

commenced this *pro se* civil rights action under 42 U.S.C. § 1983 against Defendants Physician

Assistant ("PA") Patrick M. Johnston ("Johnston") and Nurse Administrator ("NA") Nancy

Smith ("Smith").  (Dkt. No. 1.)  Plaintiff claims that during the two months he was confined at

Upstate Correctional Facility ("Upstate"), Defendants were deliberately indifferent to his serious

medical needs in violation of his rights under the Eighth Amendment by failing to schedule an appointment for him to see a doctor to obtain a bottom bunk pass which he claims was necessitated by chronic back problems that caused severe pain and old gun shot wounds to his leg that made climbing difficult; failing to prescribe appropriate pain medication for Plaintiff's chronic back pain; failing to properly diagnose, treat, and provide pain medication for injuries Plaintiff sustained when he fell from the ladder while coming down from the top bunk on January 7, 2009; failing to allow him use of a bottom bunk after his fall; and failing to give him a flu shot. *Id.*

This matter is now before the Court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. Nos. 81 and 82.) For the reasons that follow, the Court recommends that Plaintiff's motion for summary judgment (Dkt. No. 81) be denied, and that Defendants' cross-motion for summary judgment (Dkt. No. 82) be granted.

I.       **BACKGROUND**

   A.       **Plaintiff's Bunk Bed History Prior to and Following his Confinement at Upstate**

Plaintiff was originally received into the custody of the Department of Corrections and Community Supervision ("DOCCS") at the Elmira Correctional Facility ("Elmira") in August of 2003. (Dkt. No. 82-6 at ¶ 4.) Plaintiff had been shot multiple times by the police while he was in the process of committing armed robbery in November of 2002. (Dkt. No. 82-17 at 20-21.) According to Plaintiff, he was shot in both legs, his private area, ankle, and shoulder. *Id.* at 21. When Plaintiff arrived at Elmira, he had a fistula of the right femoral artery in the groin area, an open sore on his left buttock, and problems with his legs and left shoulder, all traceable to his

gunshot wounds.  (Dkt. Nos. 82-6 at ¶ 6; 83 at 83-85.)

The Screening and Physical Assessment for Placement in a Double-Cell ("Double-Cell Assessment") completed by the intake nurse at Elmira on August 8, 2003, concluded that there were medical issues requiring Plaintiff to be placed in a bottom bunk at that time.[1]  (Dkt. No. 83 at 85.)  Pursuant to DOCCS Lower Bunk Placement Policy (Health Services Policy No. 1.49), issued in September of 2000, an inmate is entitled to a bottom bunk only if he has been issued a bottom bunk permit, and a bottom bunk permit may only be issued if the inmate meets the following clinical criteria:

- On medication for a seizure disorder

- Diabetes/insulin dependent

- Age over 60 years

- Weight over 300 pounds

- Documented back problems through physician review and approval (e.g., radiologic or surgical)

- Permanent physical disability, (i.e., amputee, rheumatoid arthritis)

- Diagnosis of sleep apnea.

(Dkt. No. 82-2 at 1.)  Inmates with acute injury or serious medical conditions, i.e. fractures,

---

[1]  Plaintiff testified at his deposition that from 2003 until he was transferred to Upstate, he was never placed in the top bunk.  (Dkt. No. 82-17 at 81.)  However, a number of the cell assignments listed on a locator system printout of the facilities at which Plaintiff had been housed during that time period end with a "T," which Plaintiff acknowledged at his deposition referred to top bunk.  *Id*. at 118; Dkt. No. 93-1.  Plaintiff also acknowledged having been placed in top bunks prior to his transfer to Upstate in his reply brief to Defendants' sur-reply brief.  (Dkt. No. 94 at 2.)  There is no evidence that Plaintiff was ever issued a permanent bottom bunk permit at any facility during his incarceration.  (Dkt. No. 82-1 at ¶ 20.)

recent MI, advanced arthritis, may be considered for temporary bottom bunk assignment subject to review every thirty days for continued placement.[2]  *Id.*

Zebra Cicconi-Crozier ("Cicconi-Crozier") has been a licensed Registered Nurse ("RN") since 1996, worked at Elmira for approximately six years beginning in 2003, and returned there as Nurse Administrator in 2012 after working in other DOCCS facilities.  (Dkt. No. 82-6 at ¶ 3.)  According to Cicconi-Crozier, it is not uncommon for the nursing staff to place inmates just entering DOCCS custody in a bottom bunk when there is evidence of potentially serious medical problems inasmuch as the nurses tend to err on the side of caution with reception inmates when there is no established DOCCS medical records upon which they can rely.  *Id.* at  ¶ 5.  Cicconi-Crozier concluded, based upon her review of Plaintiff's medical records, that it appeared he was initially placed in a bottom bunk due to a fistula in his groin, problems with his legs from multiple gunshot wounds, an open sore in his left buttock, and a problem with his left shoulder, apparently traceable to his gunshot wounds.  *Id*. at ¶ 6.  Given Plaintiff's medical problems and the fact that he was new to DOCCS, Cicconi-Crozier would herself have placed him in a bottom bunk when he arrived at Elmira.  *Id*.  at ¶ 7.  She noted, however, that if Plaintiff's medical problems resolved, he would no longer qualify for a bottom bunk unless he met one of the criteria in the DOCCS bottom bunk policy.  *Id*.

Plaintiff concedes that when he was transferred to Wende Correctional Facility ("Wende") a few months later in October of 2003, the nurse performing his medical intake review determined that he did not meet any of the DOCCS criteria for a bottom bunk at that

---

[2]  Plaintiff concedes that DOCCS has a bottom bunk policy but contends it is unconstitutional.  (Dkt. Nos. 82-22 at ¶ 21; 92-2 at ¶ 21.)

time.[3]  (Dkt. Nos. 82-22 at ¶ 42; 92-2 at ¶ 42.)  In April of 2006, Plaintiff was transferred to

Livingston Correctional Facility ("Livingston").  (Dkt. No. 82-1 at ¶ 26.)  The intake nurse

determined that Plaintiff had "no limitations as a result of his health."  (Dkt. No. 83 at 87.)

However, on May 2, 2006, an RN at Livingston gave Plaintiff a temporary bottom bunk until his

next doctor's appointment.  (Dkt. No. 83 at 10, 88.)  The RN's May 2, 2006, note in Plaintiff's

Ambulatory Health Record ("AHR") refers to documentation of August 8, 2003, when Plaintiff

was found to require a bottom bunk at Elmira.  *Id*. at 10.  When the doctor at Livingston saw

Plaintiff on May 8, 2006, he determined that there was no medical necessity for Plaintiff to have

a bottom bunk.  *Id*. at 11.  Plaintiff admits the doctor made that determination.  (Dkt. No. 92-2 at

¶ 45.)

Plaintiff was transferred to Orleans Correctional Facility ("Orleans") in September of

2007.  (Dkt. No. 82-1 at ¶ 30.)  The Double-Cell Assessment completed by the intake nurse at

Orleans on September 26, 2007, reveals that the nurse found no medical indications requiring

Plaintiff to have a bottom bunk.  (Dkt. No. 83 at 91.)  Plaintiff was housed at Cayuga

Correctional Facility ("Cayuga") from November of 2007 until late 2008.  (Dkt. No. 82-1 at

¶ 32.)  A Medical Problem List printout from August of 2008, while Plaintiff was at Cayuga,

_____

[3]  Plaintiff has admitted Defendants' Statement of Material Facts stating that he was found not to meet the criteria for a bottom bunk at Wende, Livingston, Orleans, and Clinton. (Dkt. Nos. 82-22 at ¶¶ 42-43, 46, 51 and 56; 92-1 at ¶¶ 42-43, 46, 51 and 56.)  However, Plaintiff has added a comment to each admission to the effect that the particular facility does not have long term double bunking like Upstate.  (Dkt. No. 92-1 at ¶¶ 42-43, 46, 51 and 56.)  Plaintiff explained in a Reply Brief (Dkt. No. 94) to Defendants' Sur-Reply Brief (Dkt. No. 93) that his comment was not intended to mean that there were no double bunks at the facilities, but that there was no "long term" double bunking, and that he was not required to remain in a top bunk for even half of the two months he spent in a top bunk at Upstate in any other facility where he was housed.  (Dkt. No. 94 at 2.)

contains no SR1D code, which would have been present if he had a permanent bottom bunk placement.[4]  *Id*.  Plaintiff admits that no medical indication for a bottom bunk permit was apparent on his Health Screening for Intrasystem Transfer form prepared on or about December 2, 2008.  (Dkt. Nos. 82-22 at ¶ 49; 92-1 at ¶ 49.)

Plaintiff was housed at Upstate from December 5, 2008, to February 4, 2009.  (Dkt. Nos. 82-22 at ¶ 50; 92-2 at ¶ 50.)  Plaintiff was then transferred to Clinton Correctional Facility ("Clinton").  (Dkt. No. 82-1 at ¶ 77.)  As of October 21, 2009, while Plaintiff was at Clinton, his Medical Problem List contained no SR1D code, which meant that as of that date he had still not been issued a permanent bottom bunk permit.  (Dkt. Nos. 82-22 at ¶ 51; 92-2 at ¶ 51.)

When Plaintiff was transferred to Franklin Correctional Facility ("Franklin") in October of 2009, the Health Screening for Intrasystem Transfer found no reason for assigning him to a bottom bunk.  (Dkt. No. 82-22 at ¶ 52; 92-2 at ¶ 52.)   A nurse's note in Plaintiff's AHR, dated October 30, 2009, about a week after his transfer to Franklin, records the following interaction with Plaintiff:

> Objective:     Would like bottom bunk. lumbar spine x-ray
>                negative
>
> Assessment:   does not meet criteria - threatens to fall off top bunk
>                if not issued ↓ bunk.  States already has lawsuit in
>                place @ last facility

(Dkt. No. 83 at 59.)  Plaintiff denies making any threat.  (Dkt. Nos. 82-17 at 101-04; 92-1 at ¶ 9.)

---

[4]  Plaintiff denies Defendants' Statement of Material Facts regarding the significance of the absence of an SR1D Code in his response.  (Dkt. Nos. 82-22 at ¶ 48; 92-2 at ¶ 48.)  The reason for the denial is that Plaintiff has no knowledge of SR1D codes.  (Dkt. No. 92-1 at ¶ 7.) The SR1D code, as explained by Smith, is included under "Medical Conditions" on the inmate's Medical Problem's List when the inmate has been granted a permanent bottom bunk permit. (Dkt. No. 82-1 at ¶ 20.)

According to Plaintiff, the RN ignored his medical condition so he told her that he had problems in the past with the top bunk, sustaining an injury when he fell. (Dkt. No. 92-1 at ¶ 9.) Plaintiff told the nurse that he had spasms sometimes, and she had to take that into account. *Id*. Plaintiff claims to have informed the nurse that the staff at Upstate had disregarded his medical condition and caused him to be injured. *Id*.

Plaintiff was released on parole in 2011 and was returned to state custody in or about June of 2013 following a parole violation. (Dkt. Nos. 82-22 at ¶¶ 54-55; 92-2 at ¶¶ 54-55.) Plaintiff was returned to Wende, where an RN determined he did not meet any of the criteria for a bottom bunk. (Dkt. Nos. 82-22 at ¶ 56; 92-2 at ¶ 56.) A week later, a nurse at Elmira reached the same conclusion. (Dkt. Nos. 82-22 at ¶ 57; 92-2 at ¶ 57.)

As of March of 2014, Plaintiff's Medical Problem List did not include an SR1D code, thus indicating that he did not have a permanent bottom bunk permit at that time. (Dkt. Nos. 82-22 at ¶ 58; 92-2 at ¶ 58.)

### B. Defendants Smith and Johnston

Defendant Smith has been employed as an RN by DOCCS for twenty-four years, has been an NA since 2001, and has been NA at Upstate since 2003. (Dkt. No. 82-1 at ¶ 1.) As NA, Smith oversees the administration of nursing care at Upstate and, among other things, hires and schedules nursing staff for Upstate, and serves as a liaison between the nursing staff and facility administration. *Id*. As a part of her job responsibilities, Smith also handles complaint letters from inmates. (Dkt. No. 82-1 at ¶¶ 54-55.) Smith typically does not provide hands on nursing care. *Id*. at ¶ 3. Smith never provided hands on nursing care to Plaintiff while he was at Upstate. (Dkt. Nos. 82-22 at ¶ 120; 92-2 at ¶ 120.)

Johnston has been registered as a PA in New York for more than thirty-one years, working in the area of internal medicine. (Dkt. No. 82-5 at ¶¶ 1-2.) Johnston worked on a half-time basis at Upstate, splitting a full-time position with another PA from 2006 until May of 2010. *Id* at ¶ 3. Johnston worked two eight hour days one week and three eight hour days the next, beginning at 6:00am. *Id.* During the time he was at Upstate, the facility also generally had one full-time facility physician, one half-time physician, and a nurse practitioner. *Id*. PAs at Upstate functioned in the role of primary care practitioner. *Id*.

Johnston would generally spend his time at Upstate seeing patients who had been scheduled to see him by the RN assigned to the building. *Id*. at ¶¶ 5-6. Johnston did not schedule inmate appointments himself so that unless and until he saw the patient or reviewed his chart, he typically had no knowledge of the patient's medical condition or status. *Id*. at ¶¶ 5-6.

## C. Nursing Coverage at Upstate

Upstate contains four Special Unit Housing ("SHU") blocks, each of which can house up to 300 inmates. (Dkt. Nos. 82-22 at ¶ 5; 92-1 at ¶ 5.) A nurse exam room with two desks (one for the nurse and one for the medical provider), an examination table, a medicine cart, and a medicine cupboard, is located on the first or ground floor of each SHU block. (Dkt. Nos. 82-22 at ¶ 6; 92-1 at ¶ 6.) One RN is assigned to each block on the day and evening shifts, and the day shift nurses make rounds throughout the building one time per day, while the night shift nurse makes rounds twice per day. (Dkt. Nos. 82-22 at ¶ 7; 92-1 at ¶ 7.) During the midnight shift (10:00pm to 6:00am), two nurses cover the entire facility, with one stationed in the infirmary and the other going through the blocks, checking inventory, and pulling charts for inmates who have requested sick call the following day. (Dkt. Nos. 82-22 at ¶ 8; 92-1 at ¶ 8.)

**D.     Processing of Medical Prescriptions at Upstate**

There is no pharmacy or pharmacist at Upstate.  (Dkt. No. 82-8 at ¶ 2.)  There is a pharmacy office which has been staffed by Pharmacy Aide, Marlene Perry ("Perry"), since March of 2000.  *Id.* at ¶¶ 1-2.  Perry's duties and responsibilities as Pharmacy Aide include obtaining prescription medications for Upstate inmates at outside pharmacies.  *Id.* at ¶ 1.  Perry only works the day shift Monday through Friday, and the pharmacy office is closed when she has the day off and on weekends and state holidays.  *Id.* at ¶ 3.  When the pharmacy office is closed, the nursing staff procures medication that is needed immediately.  *Id.*

There is a locked drop box outside the infirmary for refill sheets, prescriptions that do not have to be filled stat, and other requests directed to Perry.  *Id.* at ¶ 5.  Perry makes a photocopy of prescriptions she receives and faxes the sheet to Health Direct, one of the pharmacies used by Upstate.  *Id.*  The original prescription is maintained for seven years.  *Id.*  Medications from Health Direct generally arrive within a day or so after the prescription is faxed.  *Id.* at ¶ 6.

According to Johnston, he normally kept at least one prescription pad in each area where he worked and would carry another one, so that he would have a pad available when he needed to write a prescription.  (Dkt. No. 82-5 at ¶ 24.)  It was his usual custom and practice when ordering medication or other treatment to write an accompanying note in the patient's medical chart, documenting the treatment, in addition to writing out the prescription.  *Id.* at ¶ 23.  Once Johnston wrote a prescription, he generally left it with the file.  *Id.* at ¶ 25.  The nursing staff and pharmacy aide handled everything from there in terms of processing the prescription and administering the medication to the inmate.  *Id.*

**E.       Plaintiff's Medical Intake Exam at Upstate**

When an inmate is transferred to a different DOCCS facility, an RN at the new facility does an "intake" examination.  (Dkt. Nos. 82-22 at ¶ 28; 92-1 at ¶ 28.)  The RN assesses the inmate's general health to determine if he has any potentially life-threatening or serious conditions that need uninterrupted treatment or immediate attention.  *Id*.  If so, the RN arranges to have appropriate medical care put in place to address the issues right away, without having to wait for a routine medical provider appointment which could take weeks or months.  *Id*.

As a part of the intake exam, the RN obtains information concerning the inmate's medical conditions not only from the inmate himself but from his medical chart, including an "outdraft" note prepared by the medical staff at the facility from which the inmate is transferring that summarizes his medical condition to expedite review at the new facility.  (Dkt. Nos. 82-22 at ¶ 29; 92-1 at ¶ 29.)

The RN who conducted Plaintiff's intake examination at Upstate prepared: (1) an entry in Plaintiff's AHR (Dkt. No. 83 at 42-43); (2) Health Screening for Intrasystem Transfer, *id*. at 99-100; (3) "S" Block SHU Entrance Exam Form, *id*. at 101-02; Inmate Orientation Form, *id.* at 103-04; and (5) Double-Cell Assessment.  *Id*. at 105.

Plaintiff's AHR reveals that when he arrived at Upstate his existing health problems were asthma and chronic back pain as well as a current medical complaint of right leg pain.  *Id*. at 42. The medications being taken by Plaintiff immediately prior to his arrival at Upstate included an Albuterol inhaler; Naproxen, 325 mg. twice a day; and Claritin 10 mg., once a day.  *Id*.  The intake RN noted in Plaintiff's AHR that he needed routine prescriptions written for Naproxen

and Claritin.  *Id*. at 43.

According to Smith, Plaintiff's intake records gave no indication that he met any of the criteria listed in the DOCCS bottom bunk policy.  (Dkt. Nos. 82-1 at ¶ 40; 82-22 at ¶ 62.)  The intake RN concluded that there was no known medical reason why Plaintiff needed to be placed in a bottom bunk, and Plaintiff was placed in a top bunk.  (Dkt. Nos. 82-22 at ¶¶ 63, 67; 92-1 at ¶¶ 63, 67.)  Plaintiff claims, however, that he has back problems and he is permanently disabled from his gunshot wounds.  (Dkt. No. 92-2 at ¶ 62.)

Plaintiff contends he informed the RN at his intake exam that he had previously received a diagnosis from a qualified PA at the Elmira reception center that his physical condition required him to be housed in a bottom bunk, and that the recommendation had been a part of his medical records since August 4, 2003.[5]  (Dkt. No. 1 at ¶ 1.)  Plaintiff claims he also verbally reminded the RN that his physical condition would make it extremely difficult, if not impossible, for him to climb in and out of the top bunk.  *Id*.  According to Plaintiff, the RN told him he would have to see a doctor before he could receive a bottom bunk.  *Id*.; Dkt. No. 82-17 at 79-80.

### F.    Plaintiff's Medical Care at Upstate Pre-January 7, 2009

On December 9, 2008, in response to the intake RN's note, Johnston wrote prescriptions for Plaintiff for Naproxen 325 mg. and Claritin 10 mg., but he did not see Plaintiff.  (Dkt. Nos. 82-1 at ¶ 40; 82-22 at ¶ 62.)  The same day, Plaintiff asked the sick call nurse for over-the-counter Ibuprofen, which was given to him.  (Dkt. Nos. 82-1 at ¶ 62; 82-22 at ¶ 62.)  Plaintiff claims that he also asked the sick call nurse for a bottom bunk pass, and the nurse failed to

---

[5]  There is no indication in Plaintiff's medical chart that he requested a bottom bunk at intake.  (Dkt. No. 82-1 at ¶ 41.)

document the request. (Dkt. No. 1 at ¶ 2.) On December 12, 2008, Plaintiff requested a refill of the Naproxen and Claritin prescriptions, and according to the sick call nurse, the refills were processed, leaving Plaintiff with twenty-three remaining refills. (Dkt. Nos. 82-1 at ¶ 46; 83 at 43.)

Plaintiff fell from his bunk during the early morning hours of December 16, 2008. (Dkt. Nos. 82-1 at ¶ 71; 82-22 at ¶ 71.) According to Plaintiff, he was half way down the ladder when his leg locked, and he fell to the floor hitting the back of his head. (Dkt. No. 82-17 at 51-52.) At approximately 6:45am, Plaintiff reported to the sick nurse that he fallen and injured his groin. (Dkt. Nos. 82-1 at ¶ 71; 82-22 at ¶ 71.) Plaintiff explained that he was already experiencing pain from his injuries and that his condition had worsened, and he asked to see a doctor and to have an x-ray to make sure nothing was damaged. (Dkt. Nos. 1 at ¶ 3; 82-17 at 52-53, 97.) A nurse, not a party to this action, examined Plaintiff and, as documented on his medical chart, found no apparent injury, concluded that Plaintiff needed no treatment, and did not schedule him to see a medical provider. (Dkt. Nos. 82-1 at ¶ 72; 82-22 at ¶ 72.) Plaintiff asked for another refill of his Naproxen and Claritin prescriptions on December 16th, leaving him with twenty-two refills. (Dkt. Nos. 82-1 at ¶ 73; 82-22 at ¶ 73.)

On December 20, 2008, Plaintiff was seen by a nurse on sick call rounds and asked for, among other things, an appointment with the facility PA to get a flu shot.[6] (Dkt. Nos. 82-22 at ¶ 74; 92-1 at ¶74.) The nurse told Plaintiff he would receive a flu shot because of his asthma. *Id.* However, Plaintiff did not receive a flu shot while he was confined at Upstate. (Dkt. Nos. 1 at

---

[6] At Upstate, flu shots were provided by nursing staff, not by medical providers. (Dkt. Nos. 82-22 at ¶ 75; 92-1 at ¶75.)

¶ 4; 82-17 at 46.)

Between December 22, 2009, and January 6, 2009, Plaintiff was seen by the RN on sick call seven times, mostly for skin related complaints. (Dkt. Nos. 82-22 at ¶ 85; 92-2 at ¶ 85.) According to his medical records, during that time Plaintiff complained once of allergies and once of back pain. *Id.* Plaintiff requested another refill of his Naproxen and Claritin prescriptions on December 23, 2008, leaving him with twenty-one refills remaining. (Dkt. Nos. 82-22 at ¶ 76; 92-1 at ¶76.) On December 30, 2008, Plaintiff requested another refill of his Naproxen and Claritin prescriptions, leaving him with twenty refills remaining. (Dkt. Nos. 82-22 at ¶ 86; 92-1 at ¶ 86.)

### G. Plaintiff's Medical Care at Upstate from January 7, 2009, Until his Transfer to Clinton

On January 7, 2009, Plaintiff fell from the bunk bed ladder for a second time and was seen in the facility emergency room. (Dkt. Nos. 82-22 at ¶ 87; 92-2 at ¶ 87.) The non-party RN who saw Plaintiff in the emergency room indicated in Plaintiff's AHR that he reported hitting the back of his head but denied loss of consciousness and complained of discomfort/pain in the left/middle area of his back. Palpation of Plaintiff's left middle back by the nurse revealed muscle tightness associated with spasm. *Id.; Dkt. No. 83 at 48.* The RN's examination revealed that Plaintiff's vital signs were stable, he was alert, and was able to sit up with assistance. (Dkt. No. 83 at 48.) The nurse found no bruising or swelling or open areas on the back of Plaintiff's head. *Id.* Plaintiff was able to bear his full weight. *Id.*

Plaintiff also saw Defendant Johnston for the first time in the facility emergency room on January 7, 2009. (Dkt. Nos. 82-5 at ¶ 18; 82-22 at ¶ 87; 92-2 at ¶ 87.) Johnston documented

Plaintiff's chief complaint as low back pain without loss of consciousness. (Dkt. Nos. 82-22 at ¶ 89; 92-2 at ¶ 89.) Upon physical examination, Johnston observed that Plaintiff's gait was slow but steady, and that he was able to move all of his extremities. *Id.* Johnston elicited tenderness to palpitation in Plaintiff's lumbro-sacral spine area and ordered an x-ray of his lumbar spine. *Id*. Johnston read the x-ray as being negative as did the radiologist, who found that the x-ray revealed no abnormality. *Id*. Johnston diagnosed Plaintiff as having sustained a back contusion i.e., bruising of the soft tissues such as muscles, ligaments, and tendons in the area. (Dkt. Nos. 82-22 at ¶ 90; 92-2 at ¶ 90.)

Johnston prescribed Flexeril 10 mg. three times a day for five days; Naproxen 500 mg. twice a day for five days; and a temporary bottom bunk permit for seven days. (Dkt. Nos. 82-5 at ¶ 22; 83 at 48.) Johnston had found the prescribed treatment regimen successful for the type of injury sustained by Plaintiff in a vast majority of cases. (Dkt. No. 82-5 at ¶ 22.)

Plaintiff has complained that Johnston forced him to walk back to his cell when he could not even stand up and his back was feeling like vice grips. (Dkt. No. 82-17 at 38.) According to Johnston, he saw no reason why Plaintiff could not ambulate back to his cell under his own power as he was able to move all his extremities and bear his full weight. (Dkt. No. 82-5 at ¶ 29.) Moreover, Johnston saw no reference in the medical record to Plaintiff requesting transport. *Id*. According to Johnston, transport arrangements are typically handled by security and the nursing staff in any event. *Id*.

Plaintiff's AHR shows that he was occupying the bottom bunk on January 8, 2009, as designated by the "B" following the cell number, and the top bunk, as designated by the "T" again on January 13, 2009. (Dkt. No. 83 at 49.) However, Plaintiff contends he was never

moved to a bottom bunk in accordance with Johnston's instructions.  (Dkt. No. 82-17 at 39, 56, 74.)

Plaintiff saw Johnston for the second and last time on January 15, 2009, when he had a routine asthma evaluation.  (Dkt. Nos. 82-22 at ¶¶ 100, 104; 92-2 at ¶¶ 100, 104.)  Plaintiff testified at his deposition that when Johnston asked him about the back injury he had sustained on January 7, 2009, Plaintiff told him that he was still having pain and had not yet been given a bottom bunk.  (Dkt. No. 82-17 at 73-74.)  Plaintiff testified that he told Johnston he thought he needed physical therapy since his back was still tight.  *Id*. at 74.  Plaintiff also complained that he had not received his flu shot.  *Id*.  Johnston does not recall Plaintiff complaining about either his back or the flu shot, and states that while it is his usual practice to document medical complaints, there is no documentation of such complaints by either him or the nurse with whom he was working that day.  (Dkt. No. 82-5 at ¶ 32.)

Although pain medication was apparently delivered to Plaintiff in his cell at 8:00pm on January 7, 2009, as of January 17, 2009, when he saw RN Candy Atkinson ("Atkinson"), he had still not received the Flexeril 10 mg. or Naproxen 500 mg. prescribed by Johnston on January 7, 2009.  (Dkt. Nos. 82-7 at ¶¶ 9-10; 83 at 50.)  When Plaintiff told Atkinson about the medication, she checked the refill log and determined that there was no record that Plaintiff had ever received the Flexeril or the new Naproxen order increasing the dosage to 500 mg. from 325 mg.  (Dkt. No. 82-7 at ¶ 10.)  Atkinson determined that the medication did not appear urgent at that point because Plaintiff had seen Johnson on January 15, 2009, and had not mentioned that he had never received the Flexeril and Naproxen 500 mg.  (Dkt. No. 82-7 at ¶ 13.)  In addition, since the PA had not discontinued Plaintiff's previous Naproxen prescription, Plaintiff could have ordered

refills, and he was also receiving over-the-counter pain medication from the medication cart at his request. *Id*.

Atkinson sent a note to Perry regarding the medications and was later told by her that the pharmacy office had never received the January 7, 2009, prescriptions for Plaintiff. (Dkt. Nos. 82-7 at ¶¶ 13, 15; 82-8 at ¶ 18.) Atkinson wrote a note in Plaintiff's AHR alerting the medical provider and indicating that new orders were needed. *Id*. at ¶ 15. Atkinson saw Plaintiff again on January 20, 2009, and he asked her for Tylenol, which she gave him, and for a refill of his Claritin prescription. *Id*. at ¶ 14. Atkinson noted that Plaintiff was able to fully bear his entire weight with an upright posture and exhibited a normal gait. *Id.*

Johnston saw Atkinson's note that Plaintiff had not received the Flexeril and Naproxen 500 mg. when he was doing patient care on January 20, 2009. (Dkt. 82-5 at ¶ 36.) It was the first time he learned that Plaintiff had not received the medications. *Id.* When it was brought to his attention, he re-ordered both medications the same day. *Id*. at ¶ 37; Dkt. No. 83 at 51. Plaintiff signed for the Flexeril (generic Cyclobenzaprine was dispensed) and Naproxen on January 20, 2009, and received refills of both on January 27, 2009, and February 3, 2009, before being transferred out of Upstate. (Dkt. Nos. 82-8 at ¶ 18; 82-9.)

### H.  Plaintiff's Grievances and Correspondence to Defendant Smith

#### 1.  Inmate Grievance Complaint UST-37792-08

Plaintiff's Grievance Complaint UST-37792-08 is dated December 22, 2008, and was filed on December 30, 2008. (Dkt. Nos. 82-13 at ¶ 6; 82-14 at 4.) Plaintiff complained that he had put in to see the doctor about a bottom bunk because of numerous problems including his back and an injury he sustained while using the ladder on the bunk beds. (Dkt. No. 82-14 at 4.)

16

Plaintiff noted that he had been at Upstate for a little over two weeks and had not seen the doctor and asked that he be allowed to see a doctor in a timely fashion. *Id*. Plaintiff also asked that his file be present when he was at sick call because there was no proof that his problems were being documented, and that his injury be checked out by x-ray to make sure nothing had been damaged in his earlier fall from the bunk bed. *Id*.

The Inmate Grievance Resolution Committee ("IGRC") denied the grievance, as did the Superintendent on appeal. (Dkt. Nos. 82-10 at ¶ 10; 82-14 at 4-7.) Plaintiff appealed to the Central Office Review Committee ("CORC"), which on March 4, 2009, upheld the Superintendent's determination. (Dkt. No. 82-14 at 1.)

2.      Plaintiff's Letter to Defendant Smith dated December 26, 2008

On December 26, 2008, Plaintiff wrote a letter to Smith concerning a problem he was having with the medical staff and his housing arrangement. (Dkt. No. 81-4 at 24.) Plaintiff explained that he had multiple gunshot wounds in his leg and shoulder which made it difficult for him to climb the bunk ladder. *Id*. According to Plaintiff, he had been informed that he had to see the doctor in order to be placed on the bottom bunk, and it had been over two weeks and nothing had been done. *Id*. Plaintiff wrote that nothing had been done even though he had explained that the medication he was taking was not helping with his pain and had informed the nurse that he had fallen off his bed. *Id*.

Smith denies receiving the letter from Plaintiff and has not found it despite a careful search. (Dkt. No. 82-1 at ¶¶ 53, 57.) According to Smith, she receives an average of fifty to sixty inmate letters each month, and when she receives a letter, she refers it to the nurse on the inmate's housing block with a memo requesting that the nurse who is caring for him and is most

familiar with the inmate and his medical problems provide Smith with pertinent information so that she can respond to the inmate. *Id.* at ¶ 54. When Smith sends out a response memo to the inmate, she makes a copy of it and files it stapled to the inmate's letter. *Id.* ¶ 55. When Smith is unavailable, Kelly Rabideau, who is acting nurse administrator when Smith is away, handles letters from inmates following the same procedures as Smith. (Dkt. No. 82-10 at ¶¶ 3-4.)

Smith contends that if she had received Plaintiff's December 26, 2009, letter she would have followed her ordinary procedures and in her response memo to him would have advised him to address the matters raised with the RN making rounds on his block. (Dkt. No. 82-1 at ¶ 58.) According to Smith, one of the reasons she defers to the RN on the block is that requests for a bottom bunk and stronger pain medication are commonly made by inmates when they are not medically warranted, and the RN on the block is in the best position to assess the requests. *Id.* In addition, it would undermine the RNs if Smith routinely overrode their judgment on such matters. *Id.* Because there is more than one RN staffed on the block and additional nurses on the night shift, if Plaintiff had a problem with one of the RNs, he could speak with another. *Id.*

If Smith had responded to Plaintiff's December 26, 2009, letter, she would have noted in her memo that he had seen five different nurses on eight different occasions during the three weeks he had been at Upstate, and there was no documented request for a bottom bunk or stronger pain medication and nothing in his medical records providing a basis for finding that he met the criteria for a bottom bunk. *Id.* at ¶ 59.

3.    Inmate Grievance Complaint UST-37993-09

Plaintiff's Inmate Grievance Complaint UST-37993-09 is dated January 12, 2009, and was filed on January 20, 2009. (Dkt. No. 82-15 at 4.) Plaintiff complained that he had been

18

having problems with the medical staff since his arrival at Upstate. *Id.* At one point, Plaintiff had a back problem and was told by a nurse the he would see a doctor soon. *Id.* On December 5, 2008, he had requested a bottom bunk and was never granted one. *Id.* Plaintiff stated in the grievance that he had fallen out of his top bunk in mid-December and requested stronger pain medication and not received it, and that he had written to Smith on December 26, 2008, and never received a response. *Id.* When Plaintiff requested sick call, the only thing they could give him was Ibuprofen, which he could not take with Naproxen. *Id.* In addition, when Plaintiff fell from his bunk the second time and injured his back, he was made to walk back to his cell after a back x-ray and was not given pain medication until 8:00pm, after he had suffered about eight hours of severe back pain. *Id.* Plaintiff claimed that at the time he wrote the grievance, he had no medication. *Id.* Plaintiff asked for an MRI, strong pain medication, physical therapy, and a bottom bunk. *Id.*

The IGRC denied the grievance. (Dkt. No. 82-15 at 6.) The IGRC concluded that according to HSPM 1.49, Plaintiff did not meet the criteria for a bottom bunk. *Id.* On appeal, the Superintendent also denied the grievance. *Id.* CORC upheld the Superintendent's determination and unanimously denied Plaintiff's grievance. *Id.* at 1.

4.  Plaintiff's Letter to Defendant Smith dated January 8, 2009

On January 8, 2009, the day after Plaintiff's second fall from his bed, he wrote a letter to Smith regarding his back injury. (Dkt. Nos. 81-4 at 25; 82-1 at ¶ 67.) Plaintiff informed Smith that he had a limited range of motion and pain and requested that an MRI be done, and that he have physical therapy for his back. *Id.* Smith responded by memo on January 9, 2009. (Dkt. No. 82-4 at 1.) In her response, Smith noted that Plaintiff had been seen by the PA on January 7,

2009, and he had seen no indication for an MRI. Smith noted that it had only been a few days since Plaintiff's fall, and advised him to address the situation at sick call if he was still having problems. *Id.* Smith also informed Plaintiff that she could not order an MRI or physical therapy as that could only be done by the PA. *Id.*

5.     <u>Plaintiff's Letter to Defendant Smith dated January 20, 2009</u>

Plaintiff wrote a third letter to Smith on January 20, 2009, complaining that he had not received the Naproxen 500 mg and Flexeril prescribed for his back injury. (Dkt. No. 82-4 at 1.) According to Smith, the letter was never received at the NA's office. (Dkt. No. 82-1 at ¶ 76.) Inasmuch as Plaintiff received the medication on January 20, 2009, there would have been nothing for Smith to do in any event. (Dkt. Nos. 82-8 at ¶ 18; 82-9.)

## II.     APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[7] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28,

---

[7] Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

1999)[8] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.    ANALYSIS

### A.    Legal Standard for Eighth Amendment Claims

The Eighth Amendment protects prison inmates from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin* ("*Hathaway I*"), 37 F.3d 63, 66 (2d Cir. 1994). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer*, 511 U.S. at 832. To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Id.*

A claim alleging that prison conditions violate the Eighth Amendment, including those claiming inadequate medical care, must satisfy both an objective and subjective requirement the conditions must be "sufficiently serious" from an objective point of view and, and the plaintiff must demonstrate that the prison officials acted subjectively with "deliberate indifference." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). On an Eighth Amendment claim that prison officials have intentionally disregarded an inmate's serious

---

[8] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

medical needs, "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester County Dept. of Corrections Medical Dept.*, 557 F. Supp.2d 408, 413 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 280).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id*. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith,* 316 F.3d at 185. If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing on the seriousness of the

prisoner's medical condition. *Salahuddin*, 467 F.3d at 280.

Medical conditions vary in severity, so a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000). A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway I*, 37 F.3d at 66. Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Id*. at 703 (quoting *Hathaway v. Coughlin* ("*Hathaway II*"), 99 F.3d 550, 553 (2d Cir. 1996)). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway I*, 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical

care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance*, 143 F.3d at 703 (quoting *Hathaway II*, 99 F.3d at 553).

**B.** **Plaintiff's Claim that He was Wrongfully Denied a Permanent Bottom Bunk Permit at Upstate**

Plaintiff claims that Defendants' failure to assign him to a bottom bunk permit at Upstate due to his back pain and pain in his right leg that left him vulnerable to falling from the top bunk, constituted deliberate indifference to his safety in violation of his Eighth Amendment rights. (Dkt. Nos. 1 at 192-2 at ¶ 63.) The record evidence does not support Plaintiff's claim.

**1.** Objective Component of Plaintiff's Claim

Plaintiff's medical records support the conclusion that, while he had chronic back pain, there was no radiologic or surgical documentation of back problems sufficient to meet the back problem criteria for a permanent bottom bunk permit set forth in DOCCS Health Services Policy No. 1.49. (*See* Dkt. No. 83.) Furthermore, there is nothing in Plaintiff's medical records showing that residual problems from his gunshot wounds satisfied any of the other clinical

criteria in the Policy, or were sufficiently serious to warrant a permanent bottom bunk pass. *Id.*; Dkt. No. 82-2 at 1.

Plaintiff relies heavily on his having been given a bottom bunk permit when he arrived at the reception center at Elmira in August of 2003. (Dkt. No. 83 at 85.) However, at that point in time, Plaintiff still had significant gunshot injuries, including a fistula in his groin, problems with his legs, an open sore on his left buttock, and a problem with his left shoulder, which are believed to have been the reason why he was issued a bottom bunk permit. (Dkt. No. 82-6 at ¶¶ 3-7.)

Although Plaintiff claims that he was never in the top bunk before arriving at Upstate (Dkt. No. 82-17 at 81), documentary evidence reveals that other than at the time of initial reception at Elmira, the only time Plaintiff was given a bottom bunk permit was when he was given a temporary permit by an RN at Livingston in May 2006. (Dkt. No. 83 at 10, 88.) Plaintiff's records reveal that the rationale for the temporary permit was the August 2003, determination made at Elmira. *Id.* at 10. The temporary permit was revoked by the doctor, who found Plaintiff had no medical necessity for a bottom bunk. *Id.* at 11.

The intake RN at Upstate found that Plaintiff did not meet the clinical criteria for a bottom bunk set forth in Health Services Policy No. 1.49, and Plaintiff has not been found to qualify for a permanent bottom bunk under those criteria at the facilities in which he has been confined since his time at Upstate. (Dkt. No. 83 at 10-11, 85, 87-88.)

Based upon the foregoing, the Court finds that the evidence in the record fails to establish that Plaintiff had a serious medical condition warranting a permanent bottom bunk pass under the established criteria.

2.     Lack of Personal Involvement

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (citations omitted).  The evidence shows that neither Johnston nor Smith was personally involved in the determination made by the intake nurse at Upstate on December 5, 2008, that Plaintiff did not meet any of the criteria for a bottom bunk permit set forth in DOCCS Health Services Policy 1.49, or in the claimed delay in scheduling an appointment with the doctor (or in this case PA) regarding Plaintiff's alleged need for a permanent bottom bunk pass.  (Dkt. Nos. 82-2 at 1; 83 at 105.)

Plaintiff has not shown that Johnston was involved in, or was even aware of, the intake nurse's determination that he was not entitled a bottom bunk permit.  His complaint is that he was not scheduled to see Johnston to request a bottom bunk permit in a timely manner.  (Dkt. 82-17 at 35-36.)  According to Johnston, he did not schedule inmate appointments himself, so unless and until he saw a patient or reviewed his chart, he typically had no knowledge of the patient's medical condition or status.  (Dkt. No. 82-5 at ¶¶ 5-6.)  The evidence in the record reveals that Johnston first saw Plaintiff on January 7, 2009, after he had fallen from the bunk bed ladder.  *Id.* at ¶ 18.

As NA, Smith acted in a supervisory capacity while Plaintiff was housed at Upstate. (Dkt. No. 82-1 at ¶¶ 1, 3, 54-55.)  There is no evidence that Smith was personally involved in the determination by the intake nurse that Plaintiff was not entitled to a permanent bottom bunk permit.  The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged

constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 872, 873 (2d Cir. 1995).[9]

As a part of her responsibilities as NA, Smith did handle inmate complaint letters at the time Plaintiff claims to have sent her a December 26, 2008, letter complaining that his gunshot wounds made it difficult for him climb the bunk bed ladder, he had been waiting over two weeks to see the doctor about being placed on the bottom bunk, and he had already fallen off the bed. (Dkt. No. 81-4 at 24.)   However, Smith denies ever having received the letter and has stated that if she had received it, she would have referred it to the nurse on Plaintiff's housing block with a request for pertinent information so that she could respond to Plaintiff, and in her response memo would have advised him to discuss the issue with the RN making rounds in his block.  (Dkt. No. 82-1 at ¶ 58.)  Furthermore, according to Smith, she would also have included in her memo that nothing in Plaintiff's medical records provided a basis for finding that he met the criteria for a bottom bunk.  *Id.* at ¶ 59.  Based upon the foregoing, the Court concludes that there is no basis for supervisory liability against Smith with regard to the determination that Smith did not qualify

---

[9]  In *Raspardo v. Carlone,* 770 F.3d 97, 117 (2d Cir. 2014), the Second Circuit noted that it had not determined "the contours of the supervisory liability test . . . after *Iqbal.*"  The Court found it unnecessary to do so in *Raspardo.*  Because it is unclear as to whether *Iqbal* overrules or limits *Colon*, this Court continues to apply the categories of supervisory liability set forth in *Colon.*

for a bottom bunk.

Even if Smith had received Plaintiff's December 26, 2008 letter, district courts in this circuit have routinely held that an NA who investigates a grievance does not become personally involved in the alleged underlying constitutional violation. *See DeJesus v. Albright*, No. 08 Civ. 5804 (DLC), 2011 WL 814838, at * 5-6, 2011 U.S. Dist. LEXIS 23710, at * 18-21 (S.D.N.Y. Mar. 9, 2011); *Gates v. Goord*, No. 99 Civ. 1378 (PKC), 2004 WL 1488405, at *10-11, 2004 U.S. Dist. LEXIS 12299 at * 32-35 (S.D.N.Y. July 1, 2004); *Patterson v. Lilley*, No. 02 Civ. 6056 (NRB), 2003 WL 21507345, at *6-7, 2003 U.S. Dist. LEXIS 11097, at *19-22 (S.D.N.Y. June 20, 2003); *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 267 (W.D.N.Y. 1998).

3. <u>Deliberate Indifference</u>

Even if the Court were to conclude that Johnston and Smith were personally involved in the denial of a permanent bottom bunk bed permit to Plaintiff, there is no evidence to support deliberate indifference on either of their parts. There is no evidence in the record showing that Plaintiff satisfied any of the criteria for a permanent bottom bunk pass in Health Services Policy No 1.49, or had any serious medical condition warranting a bottom bunk. There are therefore no facts shown from which an inference could have been drawn by Defendants that Plaintiff had a serious medical need for a permanent bottom bunk pass, or that they were aware that there was a need, and either Johnston or Smith consciously or intentionally disregarded or ignored it. *See Farmer* 511 U.S. at 835, 837.

**C.     Plaintiff's Claim of Inadequate Medical Treatment at Upstate**

1.     Complaint Regarding Failure to Receive a Flu Shot

According to Plaintiff, he requested but did not receive a flu shot while he was confined at Upstate, even though Defendant Johnston told him on January 15, 2009, that he would receive one shortly.  (Dkt. No. 1 at ¶ 10.)  There is no evidence in the record showing personal involvement by Smith with regard to Plaintiff not receiving a flu shot.  There is also no evidence that Plaintiff suffered any harm as a result of not being given a flu shot at Upstate.  Therefore, the Court finds that Plaintiff has failed to show that he suffered sufficiently serious harm from the failure to receive a flu shot at Upstate to establish an Eighth Amendment violation for deliberate indifference to his serious medical needs.  *See Grissom v. Rohling*, 431 F. App'x 693, 696 (10th Cir. 2011) (dismissing plaintiff's Eighth Amendment claim for failure to give him a flu shot where he failed to show sufficiently serious harm to implicate the Cruel and Unusual Punishment Clause).

2.     Complaints of Inadequate Medication for Pain Prior to January 7, 2009

When Plaintiff arrived at Upstate, he was taking Naproxen 325 mg. twice a day for chronic back pain.  (Dkt. No. 83 at 42.)  The intake RN noted in Plaintiff's AHR that he needed routine prescriptions written for the Naproxen, and the prescriptions were written by Johnston, who did not see Plaintiff at the time.  *Id*. at 43; Dkt. No. 82-1 at ¶ 40.  Plaintiff has alleged in his complaint that he complained of severe back pain to the sick-call nurse in December 9, 2008, and to the RN on duty when he fell from his bunk bed on December 16, 2008.  (Dkt. No. 1 at ¶¶ 2-3.) The complaints are not documented in Plaintiff's medical records.  (*See* Dkt. Nos 83; 82-14 at 6.)

There is no evidence of personal involvement by Johnston with regard to Plaintiff's pain medication pre-January 7, 2009, other than writing the prescription that allowed Plaintiff to continue the Naproxen 325 mg. twice a day that he had been taking prior to his transfer to Upstate. The only evidence suggesting personal involvement by Smith is Plaintiff's December 26, 2008, letter stating that he had informed a nurse that his pain medication was inadequate, which Smith denies receiving. Furthermore, as noted above, even if Smith had received Plaintiff's December 26, 2008 letter, and investigated his complaint, that would not be sufficient to constitute personal involvement by Smith in the alleged underlying constitutional violation. *See DeJesus,* 2011 WL 814838, at *5-6 (S.D.N.Y. Mar. 9, 2011).

Given the absence of evidence showing Defendants' personal involvement in determining Plaintiff's pain medication at Upstate pre-January 7, 2009, the Court finds that Plaintiff has failed to establish his Eighth Amendment claim against Defendants regarding his inadequate pain medication claim.

      3.      Complaints Regarding Plaintiff's Medical Treatment from January 7, 2009, Until His Transfer Out of Upstate

Johnston examined and treated Plaintiff when he fell from the bunk bed ladder on January 7, 2009. (Dkt. Nos. 82-5 at ¶ 18; 88-22 at ¶ 87.) Plaintiff complains that Johnston forced him to walk back to his cell when he could not even stand and was in significant pain. (Dkt. No. 82-17 at 38.) According to Johnston, he saw no reason why Plaintiff could not ambulate back to his cell as he was able to move all his extremities and bear his full weight. (Dkt. No. 82-5 at ¶ 29.)

Plaintiff also complains that he did not receive the Flexeril 10 mg. and Naproxen 500 mg., which Johnston prescribed for Plaintiff's injury on January 7, 2009, in a timely manner.

(Dkt. Nos. 82-5 at ¶ 22; 83 at 48.)  The evidence reveals that the prescriptions Johnston wrote for the Flexeril and Naproxen 500 mg. were not received by the pharmacy office, and when Johnston found out from a note left in the file by Nurse Atkinson, who was told about it by Plaintiff on January 17, 2009, he re-ordered the medications the same day.  (Dkt. Nos. 82-5 at ¶¶ 36-37; 83 at 51.)  Plaintiff signed for the medication on January 20, 2009, and was given refills on January 27, 2009, and February 3, 2009, before being transferred out of Upstate.  (Dkt. Nos. 82-8 at ¶ 18; 82-9.)

On January 8, 2009, Plaintiff sent a letter to Smith complaining of pain and a limited range of motion and requesting that an MRI be done and that he have physical therapy for his back.  (Dkt. No. 81-4 at 25.)  Smith, who had no authority to order an MRI or physical therapy for Plaintiff, responded to Plaintiff's letter that Johnston had seen no indication for an MRI and that Plaintiff should give it a few days to see if things improved.  (Dkt. No. 82-4 at 1.)  Smith advised Plaintiff to address any continuing problems at sick call.  *Id.*

### a.      Johnson's Diagnosis and Treatment of Plaintiff's Injuries

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Sonds v. St. Barnabus Hosp. Corr. Health Serv.*, 151 F. Supp.2d 303, 311 (S.D.N.Y. 2001) (citations omitted).  A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim.  *Id.*  The fact that a plaintiff might have preferred an alternative treatment or believes he did not get the medical attention he wanted, does not rise to the level of a constitutional violation.  *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of medical intervention implicate medical judgment and not the Eighth

Amendment. *Sonds*, 151 F.Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Moreover, medical judgments that amount to negligence or malpractice do not become constitutional violations because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence is not actionable under § 1983).

Johnston's decision to order an x-ray of Plaintiff's lumbar spine and not an MRI as Plaintiff wanted implicates medical judgment and not the Eighth Amendment.[10] *Sonds*, 151 F.Supp. 2d at 312. Not ordering physical therapy likewise implicated Johnston's medical judgment. According to Johnston, the treatment regimen he prescribed   Flexeril and Naproxen for what he diagnosed as a back contusion was successful for that type of injury in a vast majority of cases. (Dkt. No. 82-5 at ¶ 22.) The fact that Plaintiff disagreed and wanted an alternative diagnostic technique to be used and different treatment to be undertaken does not rise to the level of a constitutional violation. *Sonds*, 151 F. Supp.2d at 311. The record is devoid of evidence that Johnston acted with deliberate indifference in the diagnosis and treatment of Plaintiff's back injury.

The Court finds that Plaintiff's claim that being required to walk back to his cell by Johnston after being examined when he could not stand and was in severe pain constituted a violation of his Eighth Amendment right to be free from cruel and unusual punishment fails as well. There is no evidence of a conscious disregard of a substantial risk of serious harm to Plaintiff on Johnston's part in having Plaintiff walk back to his cell. *See Chance*, 143 F.3d at 703. Plaintiff was able to ambulate, and at most, having Plaintiff walk back to his cell

---

[10] Because the evidence reveals that Smith had no authority to order an MRI or physical therapy and so advised Plaintiff, the Court finds that she was not personally involved in Plaintiff's treatment despite his complaint letter to her of January 8, 2009. (Dkt. No. 82-4 at 1.)

constituted negligence or an inadvertent failure to provide adequate medical care on Johnston's part. *See Estelle*, 429 U.S. at 106 (negligence and the inadvertent failure to provide adequate medical care do not state a valid claim under the Eighth Amendment).

b.  Plaintiff's Failure to Receive the Medication Prescribed by Johnston in a Timely Manner

While the record clearly supports Plaintiff's claim that he did not receive the Flexeril and Naproxen prescribed by Johnston until January 20, 2009, the evidence establishes that once Johnston prescribed medication, it was his practice to leave the prescription with the file, and the nursing and pharmacy staff handled having the prescription filled. (Dkt. No. 82-5 at ¶ 23, 25.) There is no evidence that Johnston played any role in the delay in filling Plaintiff's prescriptions. In fact, the evidence reveals that Johnston did not learn that the prescriptions had not been filled until he saw Atkinson's January 17, 2009, note to that effect and re-ordered the medications the same day he learned of the error. (Dkt. Nos. 82-5 at ¶¶ 36-37; 83 at 51.)

c.  Temporary Bottom Bunk Permit

According to Plaintiff, he was never given a bottom bunk as required by the seven day temporary bottom bunk pass ordered by Johnston. (Dkt. No. 82-17 at 73-74.) Plaintiff claims that he told Johnston on January 15, 2009, that he had not been given a bottom bunk as Johnston had prescribed. *Id.* Johnston has no recollection of being told about the bunk situation, and there is nothing in his medical records supporting Plaintiff's claim that he spoke to Johnston about it. (Dkt. No. 82-5 at ¶ 32.)

The record reflects that Johnston's order for Plaintiff to have a seven day temporary bottom bunk pass was properly entered in Plaintiff's medical records by Johnston. (Dkt. No. 83

34

at 48.)  Furthermore, because Plaintiff's AHR indicates that he was occupying a bottom bunk on January 8, 2009, it remains unclear whether Plaintiff was given a bottom bunk as ordered by Johnston.  *Id.* at 49.

There is, in any event, no evidence suggesting that it was a part of Johnston's duties as a PA to make sure the order was followed, and any failure on his part to do so would at best constitute negligence, which is not actionable under § 1983.  *Daniels,* 474 U.S. at 332. Moreover, even if Plaintiff did make Johnston aware that he had yet to be given a bottom bunk when he saw him on January 15, 2009, the seven day time period for which the bottom bunk had been ordered had already expired, so that the failure to implement the order on January 15, 2009, without clear evidence that Plaintiff's back injury still required a bottom bunk, would not constitute deliberate indifference to a serious medical condition for Eighth Amendment purposes.

## IV.    CONCLUSION

Based upon the evidence in the record, the Court concludes that no reasonable jury could find that Defendants Johnston or Smith violated Plaintiff's Eighth Amendment right to adequate medical care.  Therefore, the Court recommends that Plaintiff's motion for summary judgment (Dkt. No. 81) be denied, and Defendants' cross-motion for summary judgment (Dkt. No. 82) be granted.  Inasmuch as the Court is recommending that Defendants' be granted summary judgment for the reasons set forth herein, it finds it unnecessary to reach Defendants' qualified immunity argument.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 81) be **DENIED** and Defendants' cross-motion for summary judgment (Dkt. No. 82) be **GRANTED**;

and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: November 16, 2015
     Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.  |  Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

### MEMORANDUM & ORDER

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

### REPORT AND RECOMMENDATION

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

### Background

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993,
the plaintiff was in keeplock because of an altercation with
prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock
is confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony Annucci
dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates
in keeplock must apply for written permission to attend
regularly scheduled religious services. (Reply Affidavit of
George Schneider in Further Support of Defendants' Motion
for Summary Judgment dated September 9, 1996 ("Schneider
Aff.") ¶ 3). Permission is granted unless prison officials
determine that the inmate's presence at the service would
create a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green Haven
is for the captain's office to review all requests by inmates
in keeplock to attend religious services. (Schneider Aff. ¶ 3).
Written approval is provided to the inmate if authorization
is granted. (Affidavit of Richard Pflueger dated April 26,
1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the
appropriate form to the gate officer before being released to
attend the services. (Pflueger Aff. ¶ 5).

 **\*2**  On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),
attached as Exh. B to Schneider Aff.) On June 30, 1993, a
supervisor identified as Captain Warford signed the request

form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

**A. *Standard for Summary Judgment***

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also* *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party

must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts.Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted)."The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful."*Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ' *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *prose,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest."*McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *prose* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *prose* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See* *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work

product of *prose* litigants should be generously and liberally construed, but [the *prose'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *prose* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

## B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock.*Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *SeeBenjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."*Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison.*O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."*Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *SeeDavidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

## Conclusion

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

## All Citations

Not Reported in F.Supp.2d, 1999 WL 983876

## Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 814838
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

William DE JESUS, Plaintiff,

v.

Joy ALBRIGHT, et al., Defendants.

No. 08 Civ. 5804(DLC). | March 9, 2011.

**Attorneys and Law Firms**

William De Jesus, Auburn, NY, pro se.

Jeb Harben, Assistant Attorney General, New York, NY, for
defendants.

### *OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** Plaintiff William De Jesus ("De Jesus"), proceeding
*pro se,* brings this action pursuant to 28 U.S.C. § 1983
against various employees of the New York State Department
of Correctional Services ("DOC") in their individual
capacities. [1] De Jesus alleges that, while he was incarcerated
in the Fishkill Correctional Facility ("Fishkill"), defendants
violated his constitutional rights by failing to attend to
his medical needs. Defendants have moved for summary
judgment pursuant to Fed.R.Civ.P. 56. For the following
reasons, the motion is granted in part.

### *BACKGROUND*

### I. The Parties

Unless otherwise noted, the following facts are undisputed.
Plaintiff De Jesus is a prisoner in the custody of the DOC. At
the time he filed the complaint, he was resident at Fishkill.
Defendant Dr. John Supple ("Supple") is a physician at
the Regional Medical Unit ("RMU") at Fishkill who served
as plaintiff's primary health care provider. Defendant Dr.
Edward Sottile ("Sottile") is a physician and the Facility
Health Services Director at the Fishkill RMU. His duties
include supervising all medical treatment and the medical
staff at Fishkill, including Supple. Defendant Joy Albright
("Albright") is the Nurse Administrator of the Fishkill RMU,
in charge of supervising the clinical practice of nurses at that

facility, but, according to DOC policies, not a supervisor of
the medical care given by doctors. Defendant Angie Maume
("Maume") is the Acting Deputy Superintendent of Health
Services at the Fishkill RMU, directing the operations and
coordination of support services at the facility, but not,
according to DOC policies, directing inmate medical care.
Defendant Elizabeth Williams ("Williams") is the Deputy
Superintendent of Health Services of the Fishkill RMU, who
like Maume, directs support services at the Fishkill RMU, not
medical care. [2]

### II. Medical Treatment Prior to Arriving at Fishkill

De Jesus alleges a history of medical ailments that dates
back to October 2005 while resident at New York State's
Upstate Correctional Facility. His various medical complaints
started with a chronic sore throat, and later included eye
pain, problems with eyesight, chronic migraine headaches
and continued sore throat.

While resident at Great Meadows Correctional Facility
("Great Meadows") and, later, Coxsackie Correctional
Facility ("Coxsackie") De Jesus received medical care for
his throat and eye complaints. He was examined by an
otolaryngologist (an ear, nose and throat specialist, or "ENT")
in May 2006, when he underwent a CT scan of his throat
and was prescribed medication for acid reflux. He was again
seen by an ENT in July 2007. In response to complaints about
chest pains and seeing flickering lights, De Jesus was given
an electrocardiogram ("EKG") in November 2006, the results
of which were normal. De Jesus's vision problems were
examined by an optometrist in May 2007, who prescribed him
glasses, and an ophthalmologist in July 2007, who could not
identify anything wrong with his eyes. His medical history
indicates that his first complaint of migraine headaches
occurred in July 2007. De Jesus was also twice examined
by psychiatrists in the Office of Mental Health ("OMH") at
Great Meadows in November 2006, neither of whom referred
him for further mental health services related to his physical
symptoms.

### III. Plaintiff's Medical Treatment at Fishkill

**\*2** De Jesus's complaint concerns the medical care he
received during his time at Fishkill, where he was transferred
in October 2007. From the beginning of De Jesus's
confinement at Fishkill, Supple was assigned to serve as his
primary health care provider. De Jesus was seen regularly
by Supple and nurses in the RMU starting very shortly after
his transfer to Fishkill. These visits were first in reference

to his complaints of eye and throat pain, and seeing flashing lights. His medical records show that while at Fishkill, De Jesus consistently exhibited signs of sore throat, including inflammation, red coloration, and increased mucous. De Jesus was prescribed Claritin, triamcinolone, albuterol and other allergy medications that are designed to relieve eye pain and sore throat, among other symptoms. He was also given an x-ray of his sinuses to investigate his complaints of sore throat in November 2007.

De Jesus sent two letters of complaint about his medical treatment shortly thereafter. The first, dated November 19, 2007, was sent to Sottile, and referenced his persistent eye pain and flashing lights in his vision. The second was dated December 7, 2007 and sent to Albright, referencing his eye and throat pain.

De Jesus filed a formal grievance in January 2008 claiming that he was suffering from serious eye and throat pain and that Supple was not properly treating his condition. Nursing staff, including Albright and Maume, investigated De Jesus's grievance and provided information to the Inmate Grievance Resolution Committee ("IGRC"), which reviews such grievances. In the report denying De Jesus's complaint, the IGRC referenced his visits with Supple, the x-ray he received in November 2007 and the prior medical care plaintiff received at Great Meadows and Coxsackie as evidence that he had been receiving treatment for his eye and throat pain.

On February 10, 2008, De Jesus sent a new letter to Williams, referencing severe eye pain, flashing lights and headaches. De Jesus's headaches were referenced in the record of his March 28 medical exam, the first time they were mentioned in his medical records since arriving at Fishkill. Supple referred De Jesus for an examination by an ophthalmologist in April 2008. This exam did not reveal any abnormalities, although the ophthalmologist suggested that plaintiff's eye pain might be connected to his migraines.

De Jesus filed another grievance complaint in June 2008, complaining of eye pain, flashing lights and violent headaches, and requesting an MRI or CT scan. This grievance was also denied because the IGRC found that De Jesus had been seen by several doctors all of whom had found no "organic basis" for his complaints. Upon appeal to the DOC Central Office Review Committee, De Jesus was told that he should refer his request to Sottile, who would have authority to authorize alternate treatments. De Jesus was also

informed that he could "request a consultation from an outside provider of his choice by making necessary arrangements and assuming financial responsibility" pursuant to Health Services Policy Manual Item 7.2.

**\*3** Upon Supple's referral, Dr. Ramasree Karri ("Karri"), a psychotherapist, examined De Jesus in July 2008 but could not identify "any psychiatric condition including somatoform disorders" that could be the root of his ailments. Karri's evaluation notes indicate that plaintiff told her that his eye ailment "slows me down and hinders my ability to move around." De Jesus alleges that this evaluation, in addition to the earlier psychiatric evaluations conducted at Great Meadows, found that his complaints were not psychological. He also alleges that Karri advised plaintiff to continue to try to determine the root of his symptoms. De Jesus maintains that he has never suffered from any psychological problems or taken psychotropic medication. Karri, however, stated that although she did not identify any obvious psychiatric disorders at the time of her examination, she had not made a medical diagnosis that plaintiff's symptoms "had a diagnosable medical basis or ... could be alleviated through medical treatment."

Supple again advised De Jesus to seek counseling at OMH during examinations in August and October 2008 because "no physical basis for his symptoms ha[d] been found by several medical providers over 2+ years" and he "advised [De Jesus] to try something new that may help." De Jesus filed another grievance in August 2008, complaining generally of "medical issues" related to his throat and eyes, and seeking that Supple be removed as his primary care provider. In the grievance, De Jesus states that Supple had acted rudely and was refusing to meet his medical needs, including by repeatedly referring him to OMH. Like the prior grievances, this was denied because De Jesus had a history of receiving various types of examinations, medication and other treatment. The denial memorandum also informed De Jesus that his request for a new primary medical provider should be referred to Sottile, as the IGRC did not have authority to change his provider. On August 25 and September 15, De Jesus sent complaint letters to Sottile referencing extreme eye pain, visual complications and throat pain.

In September and October 2008, De Jesus began to complain again about severe headaches. A formal grievance he filed on October 3, which requested a change in medical provider but did not specify any particular ailments, was denied in the same manner as his earlier grievances. In October,

De Jesus requested an MRI or CT scan, or examination by a neurologist, but Supple did not order these for him. On October 21, De Jesus filed another grievance in which he complained that Supple had an unprofessional and hostile demeanor and that he was being denied specialized examinations. De Jesus wrote "I fear my life is in danger in Dr. Supple's hands."Responding to this complaint, Sottile examined De Jesus on November 7. According to Sottile's notes from the examination, De Jesus complained about his chronic sore throat, eye problems and "occasional headaches." Sottile identified a persistent sore throat problem, prescribed a flovent spray pump and suggested that a gastro-intestinal consult and/or a UGI endoscopy be performed to assess if De Jesus's sore throat was caused by acid reflux. Sottile did not recommend any of the specialized examinations that De Jesus had sought and did not agree that Supple should be removed as his primary care provider. The IGRC thereafter denied De Jesus's October 21st grievance, finding that Supple had performed his duties appropriately and that no change in medical providers was necessary. Supple did not order the gastro-intestinal consult or the UGI endoscopy that Sottile had recommended.

**\*4** In December 2008 and January 2009, De Jesus continued to complain of eye pain, sore throat, headaches and seeing flashing lights in his visits with medical staff. In January he was prescribed Imitrex, a medication for the treatment of headaches, by a Dr. Mamis, who is not a party in this case. Supple continued to prescribe De Jesus Imitrex for the next two or three months, as well as lozenges for his sore throat.

De Jesus alleges that his headaches have been entirely untreated by prison medical staff, and that he was never even prescribed over-the-counter pain medication for these headaches. De Jesus alleges that he continues to suffer from severe eye and throat pain and daily migraine headaches.

### IV. De Jesus's Medical Care Since the Filing of the Amended Complaint

Both parties have submitted evidence regarding De Jesus's medical care since the amended complaint in this action was filed on February 23, 2009. Supple continued to be De Jesus's primary care provider. In June 2009, De Jesus visited an optometrist who prescribed him new glasses. In December 2009, he was prescribed eye drops and pain medication to address his eye pain. By April 2010, De Jesus's eye pain and headaches had appeared to ameliorate, according to records from his examination by medical staff. In June 2010, Sottile

referred De Jesus for a brain CT scan to check for "cranial pathology."

On August 20, 2010, Dr. Joseph Avanzato, the Acting Facility Health Services Director of Fishkill who replaced Sottile after his retirement, ordered an MRI for De Jesus, which would provide a better analysis of any cranial pathology, if it existed, than a CT scan. The MRI report indicated that De Jesus did not suffer from any brain abnormalities such as a tumor or hemorrhage. Since at least September 2010, De Jesus has been prescribed Propranolol, a medication for the treatment of migraine headaches.

### V. Procedural History

De Jesus filed this action *pro se* on June 27, 2008. An amended complaint was filed on February 23, 2009 and served on all defendants in April 2009. The defendants filed a joint motion to dismiss the amended complaint on July 16, 2009, which was fully submitted on December 23, 2009. On January 29, 2010, it was ordered that the motion to dismiss would be treated as one for summary judgment under Fed.R.Civ.P. 56, and that consideration of the motion would take place after the parties made supplemental submissions that included De Jesus's medical and mental health records. No discovery has been taken in this action, but defendants filed supplemental briefing on summary judgment on June 4, 2010, with declarations attaching plaintiff's health records. [3] De Jesus submitted briefing and affidavits in August 2010. Defendants filed their reply brief and further affidavits on September 27, 2010.

### DISCUSSION

### I. Summary Judgment Standard

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(a); *see El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir.2010). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *El Sayed,* 627 F.3d at 933. When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine

issue for trial," and cannot "merely rest on the allegations or denials" contained in the pleadings. *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over material facts —facts that might affect the outcome of the suit under the governing law—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009). It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (citation omitted). The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims. *See Weixel v. Bd. of Ed. of the City of New York,* 287 F.3d 138, 146 (2d Cir.2002).

**\*5** De Jesus asserts a § 1983 claim against defendants for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights. De Jesus claims that defendants were deliberately indifferent to his medical needs by ignoring his complaints about and failing to treat his chronic sore throat, eye pain and vision problems, and his chronic migraine headaches. He has only demonstrated, however, that there are genuine disputed issues of fact for trial that defendants Supple and Sottile may have violated his constitutional right to receive adequate medical care for treatment of his migraine headaches.

Defendants present three arguments why they are entitled to summary judgment. First, Albright, Maume and Williams argue that they had no personal involvement in plaintiff's medical treatment, and so could not be held liable for any deliberate indifference of his needs. In addition, all defendants argue that there is no genuine issue of material fact suggesting that there was any deliberate indifference to De Jesus's medical needs. Finally, all defendants also claim that they are entitled to the defense of qualified immunity. This Opinion will address each of these arguments in turn.

## II. Personal Involvement

Albright, Maume and Williams move for summary judgment on the ground that they were not personally involved in the alleged deprivation of De Jesus's rights. Section 1983 provides in part that

> [e]very person who, under color of any statutes, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008).

A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). As a consequence, "the doctrine of respondeat superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003). It is thus "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (citation omitted). Moreover, on claims of deliberate indifference, a plaintiff must show such indifference on the part of a "particular defendant." *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003).

The personal involvement and liability of supervisory personnel is established when the supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted). Thus, a plaintiff may establish a supervisor's personal involvement by showing that:

> **\*6** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a

policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (citation omitted). [4]

De Jesus has not asserted that Albright, Maume and Williams were directly involved in De Jesus's medical treatment. De Jesus argues that they should be liable because during the grievance investigations, they maintained that his complaints were psychological in nature despite their awareness of his prior "negative psychological evaluations." De Jesus also argues that these defendants had supervisory responsibilities over the medical care provided by Supple, his primary care provider. With this awareness and responsibility, De Jesus argues, Albright, Maume and Williams had a duty to overrule Supple's denial of care and reject his assessment that the medical treatments De Jesus requested should be denied because his ailments had a psychological root.

De Jesus's characterization of the situation is not supported by the facts in three respects. First, Albright, Maume and Williams did not play either a direct or supervisory role in De Jesus's treatment, and therefore cannot be held liable for any deficiencies in his medical care. The letters De Jesus sent to Albright and Williams, to which they did not respond, are insufficient to provide evidence of personal involvement. As De Jesus concedes, their relevant actions were limited to conducting the investigations that would inform the IGRC's review of De Jesus's grievances. [5] This advisory role is confirmed by the grievance reports. De Jesus's failure to demonstrate any genuine issue suggesting that Albright, Maume or Williams were personally involved in any deprivation of his rights means that these defendants are entitled to summary judgment.

Second, there is no evidence that the rationale for the denial of De Jesus's grievance was any opinion that his ailments were psychological rather than physical. Instead, the grievance committee denials each were based on a finding that De Jesus was receiving adequate medical treatment for his ailments. Therefore, the investigation by the grievance committee took under consideration the medical opinion

of Supple that De Jesus was receiving adequate treatment, not, as De Jesus argues, an opinion that plaintiff's ailments were psychological. [6] De Jesus has provided no evidence that Albright, Maume and Williams ever denied De Jesus medical care because they "deliberately maintained" that his ailments were psychological, nor any basis to believe that discovery would provide such evidence. The grounds for the denial of De Jesus's grievances are documented, those documents have been produced, and they do not support De Jesus's arguments.

**\*7** Finally, although De Jesus argues that Albright, Maume and Williams are supervisory personnel responsible for medical care at Fishkill, they are not supervisors of the individuals whom De Jesus alleges were most directly responsible for violating his constitutional rights—doctors Supple and Sottile. Rather, these individuals are nurses who supervise some nursing and administrative staff, not the doctors in the RMU. Therefore, De Jesus cannot rely on the legal test for a supervisor's personal involvement to find Albright, Maume and Williams liable for any deprivation of his rights.

### III. Deliberate Indifference

#### A. Standard

Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "Rather, a prison official violates the Eighth Amendment only when two requirements are met." *Salahuddin,* 467 F.3d at 279 (citation omitted). The first requirement is that the alleged deprivation must be "sufficiently serious." *Id.* (citation omitted). The second requirement is that "the charged official must act with a sufficiently culpable state of mind." *Id.* at 280.

The first requirement is objective: "[o]nly deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 279 (citation omitted). Determining whether a deprivation is "sufficiently serious" requires two inquiries. First, a court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* "As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844–47). An inmate is not entitled to treatment by every

available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984).

Second, a court must determine "whether the inadequacy in medical care is sufficiently serious." *Salahuddin,* 467 F.3d at 280. "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citation omitted). If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious." *Id.* If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Id.* Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003). Even in cases where an inmate "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," those lapses will not sustain an Eighth Amendment claim. *Id.* "[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.

**\*8** "Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.* at 185 (citation omitted). Courts use a number of factors to determine whether a medical condition is serious. These factors, which are also instructive in determining whether the medical consequences of a denial of certain treatment are serious, include: "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly

affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (citation omitted).

The second requirement for an Eighth Amendment violation is subjective: the prison official must act with a "sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280 (citation omitted); *see also Caiozzo v. Koreman,* 581 F.3d 63, 71 (2d Cir.2009). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citation omitted). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citation omitted). This means that the prison official "must be subjectively aware that his conduct creates such a risk." *Id.* at 281 (citation omitted).

Prison medical staff is given wide discretion in determining how to treat inmates. In this context, "[t]he decisions of physicians regarding the care and safety of patients are entitled to a presumption of correctness." *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (citation omitted); *Church v. Hegstrom,* 416 F.2d 449, 450 (2d Cir.1969) (Section 1983 "does not authorize federal courts to interfere in the ordinary medical practices ... of state prisons."). As such, a disagreement between an inmate and medical personnel over the course of treatment does not give rise to a deliberate indifference claim. *Chance,* 143 F.3d at 703. A showing of medical malpractice is therefore insufficient to support a deliberate indifference claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Id.* (citation omitted).

The defendants argue that De Jesus has failed, first, to allege that he suffered from a "sufficiently serious" condition, or that he was deprived of any medical care for his ailments. *Salahuddin,* 467 F.3d at 280 (citation omitted). They also argue that De Jesus has failed to allege that the named individual defendants "act[ed] with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). The defendants argue that his allegations amount to, at most, a claim of negligence. Defendants are successful in showing that with respect to his sore throat and eye pain, De Jesus has failed to show that he suffered from a deprivation of medical care. But, De Jesus has put forward sufficient facts to raise a material question whether Supple and Sottile deprived him of medical care related to his complaint of chronic migraine headaches, and

did so with a sufficiently culpable state of mind. Supple and Sottile, therefore, are not entitled to summary judgment with regard to the medical care provided for De Jesus's migraine headaches.

## B. Deprivation of Medical Care in Connection with a Sufficiently Serious Medical Condition

### 1. Sore Throat, Eye Pain and Visual Problems

**\*9** Defendants argue that De Jesus's chronic sore throat, eye pain and visual problems do not rise to the level of a "serious medical condition" as required under analysis of an alleged Eighth Amendment violation. *Smith,* 316 F.3d at 186. De Jesus does not attempt to demonstrate why these ailments should be so classified, instead focusing on the debilitating effects of his chronic headaches. Moreover, De Jesus has failed to show that he was "actually deprived of adequate medical care" for these ailments. *Salahuddin,* 467 F.3d at 279.

During his incarceration at Fishkill and immediately before, De Jesus was consistently treated for his sore throat and eye complaints. He was given medication that targeted these ailments and was examined by specialists, including ENTs, ophthalmologists and optometrists, who investigated the source of his symptoms. De Jesus was given a CT scan, an X-ray, and an EKG. Sottile provided further care by prescribing De Jesus a flovent spray pump.

Against this medical history, De Jesus's allegations that he was not treated for these symptoms are truly only complaints that he was not satisfied with the exact method of treatment given or the results achieved. *See Chance,* 143 F.3d at 703. Although De Jesus claims that Supple denied him medical care because of Supple's belief that De Jesus's ailments were psychological, this is contradicted by the record showing that in addition to his referrals to OMH, Supple and other medical providers provided continuous medical care with respect to his sore throat, eye pain and vision problems. Even if De Jesus's medical care providers could arguably have provided De Jesus with further specialist examinations or medication, such as the UGI endoscopy or the gastro-intestinal consult suggested by Sottile, this is merely a disagreement about a medical judgment, not evidence of a deprivation of care. *See Estelle,* 429 U.S. at 107. The claims related to sore throat, eye pain and vision problems are therefore insufficient to withstand summary judgment. *See Wright,* 554 F.3d at 266.

### 2. Chronic Migraine Headaches

The lack of treatment of De Jesus's chronic migraine headaches leads to the opposite conclusion. First, chronic migraine headaches are often found to be "sufficiently serious" to warrant constitutional protection. *See Benjamin v. Kooi,* No. 07 Civ. 0506, 2010 WL 985844, at \*7 (N.D.N.Y. Feb. 25, 2010) (collecting cases); *Moriarty v. Neubould,* No. 02–CV–1662, 2004 WL 288807, at \*2 n. 2 (D.Conn. Feb. 10, 2004) (migraine headaches constitute a sufficiently serious condition because they can be "extremely painful and debilitating"). Plaintiff alleges that these headaches caused him severe and constant pain, and were "so serious and violent that at times he [was] unable to work, read, write, or leave his cell are for [sic] meals or activities.... [T]hey significantly affect[ed] plaintiff's daily activities."Defendants do not contest that De Jesus is suffering from headaches, nor do they argue that they do not cause him severe pain or affect his daily activities. Therefore, De Jesus has satisfied the "serious medical condition" requirement as to his complaints of chronic migraine headaches. *See Salahuddin,* 467 F.3d at 280.

**\*10** Second, there is no record of any treatment being given for his headaches between February 10, 2008, when he first complained of them once at Fishkill (through a letter of complaint), and January 23, 2009, when Dr. Mamis prescribed Imitrex, a migraine medication.[7] Even taking into account some ambiguities in the record, it appears that De Jesus's chronic migraine headaches went completely untreated for over eleven months.[8] This "failure to provide any treatment for an inmate's medical condition," where the underlying "condition is sufficiently serious," satisfies the objective requirement of the deliberate indifference claim. *Id.* Even though De Jesus has been prescribed medicines to address chronic migraine headaches since 2009 and underwent an MRI in 2010 which determined that he did not suffer from a brain abnormality that might require more aggressive treatment, De Jesus has raised a material question that the eleven-month delay in treatment was a sufficiently serious deprivation, precluding the grant of summary judgment. *See Salahuddin,* 467 F.3d at 281 (refusing to find as a matter of law that it was reasonable to postpone treatment for Hepatitis C for five months).

Defendants cite to *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 31296325, 2002 U.S. Dist. LEXIS 19371, at \*21 (S.D.N.Y. Oct. 10, 2002), to argue that De Jesus's allegations fail to recognize the sustained medical treatment he received while at Fishkill, and that his allegations are mere disagreement about proper treatment. Similarly, citing

*Estelle,* 429 U.S. at 106, defendants argue that De Jesus's claims are merely complaints that the medical treatment he received was unsuccessful at alleviating his symptoms. But these arguments are not targeted to address the lack of treatment of De Jesus's headaches for eleven months; instead, defendants gloss over this delay and concentrate on his throat and eye symptoms or speak generally about his complaints. In both *Estelle* and *Woods,* the plaintiff had unquestionably received treatment for the condition at issue. *See Estelle,* 429 U.S. at 107; *Woods,* U.S. Dist. LEXIS 19371, at * * 20–21. Defendants do not claim that De Jesus was given any treatment for his headaches until January 2009.[9] These arguments are therefore unavailing in the context of the complete failure to treat a condition for eleven months.

## C. Subjective Element

It having been found that there was no serious deprivation of medical care with regard to his throat and eye complaints, analysis of the subjective element of De Jesus's deliberate indifference claim need only consider whether Supple and Sottile had a "sufficiently culpable state of mind" in denying him care for his chronic migraine headaches. *Salahuddin,* 467 F.3d at 280. It is not necessary to find that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," only that he "evince[d] a conscious disregard of a substantial risk of serious harm."*Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation omitted).

 **\*11** De Jesus has introduced evidence to raise a genuine question that Supple and Sottile failed to treat his chronic migraine headaches while actually aware of a substantial risk that De Jesus would suffer serious harm. If, as the evidence suggests, the doctors failed to attempt any treatment of De Jesus's headaches for over eleven months, this was an "unnecessary and wanton infliction of pain."*Farmer,* 511 U.S. at 834. It is undisputed that Supple was aware of De Jesus's complaints of migraines, as they were noted in his medical records throughout 2008 after March 28 and in the grievance De Jesus filed referencing Supple's medical care in June 2008. Sottile acknowledged that he was aware of De Jesus's complaints from his consultations with Supple and noted that De Jesus suffered headaches in the report from his examination in November 2008. De Jesus alleges that his migraines were a topic he discussed with Sottile at the examination.

The defendants argue that De Jesus's complaints only describe a lack of due care or negligence, which is insufficient to sustain a deliberate indifference claim. *LaBounty v. Coughlin,* 137 F.3d 68, 72–73 (2d Cir.1998). They further cite *Wilson v. Seiter,* 501 U.S. 294, 298–303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), to support their argument that De Jesus has not presented evidence to satisfy the "wantonness" requirement of a deliberate indifference claim.*LaBounty* and *Wilson* require that a plaintiff present evidence that "the defendants knew of the health dangers and yet refused to remedy the situation."*LaBounty,* 137 F.3d at 73 (citing *Wilson,* 501 U.S. at 302–04).

De Jesus has presented medical records that show that Supple and Sottile were aware of De Jesus's complaints of migraine headaches and did not order any treatment. Although there is no specific evidence that the doctors were aware that there was a risk of continued pain in the absence of medication or other treatment for the migraine headaches, this can be inferred from the fact that such a risk is obvious. *Farmer,* 511 U.S. at 842. Supple and Sottile might have rebutted this inference by showing that they "knew the underlying facts but believed ... that the risk to which the facts gave rise was insubstantial or nonexistent,"*id.* at 844, but they have not presented evidence to support such a rebuttal. Just as in *LaBounty,* where the Second Circuit affirmed the district court's decision not to grant summary judgment, the defendants here have not pointed to contrary evidence sufficient to show there is no genuine issue of material fact that they failed to treat a condition that was a danger to De Jesus's health.

Defendants also argue that there is a "presumption of correctness" for "decisions of physicians regarding the care and safety of patients."*Kulak,* 88 F.3d at 77. The physicians' decision in *Kulak* to move the plaintiff to a new ward, however, was supported by their reasoning that this move was needed because his treatment team worked there. Therefore, the *Kulak* defendants supported this presumption of correctness by stating a reason for the challenged action. Here, Supple and Sottile have failed to provide a basis for their decision to not treat De Jesus's headaches for eleven months. Without more from the defendants, the presumption of correctness is overcome by the obvious risk attached to a failure to provide medical care for migraine headaches.

 **\*12** De Jesus spends a great deal of time in his briefs arguing that Supple's decision not to treat De Jesus's headaches was rooted in a belief that his condition was psychological and

not caused by a pathology that could be addressed by non-mental health medical treatments. He cites to *Wood v. Sun,* 865 F.2d 982 (9th Cir.1998), where the Ninth Circuit found that defendant doctors had been deliberately indifferent to an inmate's medical needs by refusing him treatment because they attributed his complaints to mental health issues. *Id.* at 990.In addressing this argument, defendants argue only that "there is no basis to infer from the record that Dr. Supple took the position that plaintiff's complaints *about his throat* were psychological ..." (emphasis supplied). As defendants have not specifically addressed whether Supple or Sottile declined to treat De Jesus's *headaches* due to a belief that they had a psychological, not a physical, cause, and because even if this was the reason for the lack of treatment, they have not presented any argument that this was a reasonable medical judgment, De Jesus has raised a genuine issue of material fact that precludes summary judgment on the subjective element. [10]

## IV. Qualified Immunity

The defendants also argue that they have qualified immunity from liability. Qualified immunity shields government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."*Tracy v. Freshwater,* 623 F.3d 90, 95–96 (2d Cir.2010) (citation omitted)."This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."*Faghri v. Univ. of Connecticut,* 621 F.3d 92, 97 (2d Cir.2010) (citation omitted). Because qualified immunity is both "a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation,"*Iqbal,* 129 S.Ct. at 1946 (citation omitted), it should be determined early in the proceedings if possible. *Cowan ex rel. Estate of Cooper v. Breen,* 352 F.3d 756, 760 (2d Cir.2003).

In evaluating a defense of qualified immunity, the first inquiry is whether, viewing the facts alleged in the light most favorable to the plaintiff, there was a constitutional violation. *Clubside, Inc. v. Valentin,* 468 F.3d 144, 152 (2d Cir.2006). The next questions are whether that right was clearly established at the time the challenged decision was made, and whether the defendants' actions were objectively unreasonable. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). A constitutional right is "clearly established" where "(1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has

recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful."*Reuland v. Hynes,* 460 F.3d 409, 420 (2d Cir.2006) (citation omitted). Courts need not address these questions in this particular order, although "it is 'often beneficial' to do so."*Finnigan v. Marshall,* 574 F.3d 57, 61 n. 3 (2d Cir.2009) (citing *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)).

**\*13** As described above, De Jesus has established a violation of his Eighth Amendment right to adequate medical care with respect to his chronic migraine headaches. This is a right that has been defined with sufficient specificity and clearly established by the Supreme Court and Second Circuit. *See Estelle,* 429 U.S. at 104; *Salahuddin,* 467 F.3d at 279. De Jesus has raised a genuine issue of material fact with regard to the reasonableness of Supple and Sottile's approach to his chronic migraine headaches, presenting evidence suggesting that they failed to provide any treatment for these headaches for over eleven months.

In support of their contention that Supple and Sottile are entitled to qualified immunity, defendants argue only that the doctors' "actions were objectively reasonable in that they were exercising their medical judgment" without further elaboration. This bald assertion does not provide an adequate ground for finding that Supple or Sottile would have been reasonable in believing that a failure to treat chronic migraine headaches was not a violation of De Jesus's Eighth Amendment rights, and certainly provides no evidence that would indicate that there is no dispute about this material issue. *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.") (citation omitted).

Sottile and Supple also argue that plaintiff has provided no evidence of a doctor disagreeing with their course of treatment for De Jesus's complaints. First, the record on this point is not at all clear. Dr. Mamis prescribed Imitrex for De Jesus's migraine headaches in January 2009, whereas Supple and Sottile had not taken any action with regard to this complaint. Whether or not this prescription is evidence of an actual disagreement depends on circumstances surrounding Dr. Mamis's evaluation that are not yet developed in the record. Secondly, it is not the burden of plaintiff to show an actual disagreement between doctors to defeat a claim of qualified immunity. Rather, qualified immunity should be granted when defendants have shown that a fact

finder could find that "reasonable officers would disagree about the legality of the defendant[s'] conduct under the circumstances." *Poe v. Leonard,* 282 F.3d 123, 133 (2d Cir.2002) (citation omitted). There is a genuine question whether reasonable doctors could have different opinions about the reasonableness of Supple and Sottile's actions and about whether not treating De Jesus's migraine headaches for over eleven months was deliberate indifference to his medical needs. Qualified immunity, therefore, cannot be granted on this ground.

***CONCLUSION***

Defendants' motion for summary judgment is granted in full as to Albright, Maume and Williams. Summary judgment is also granted as to Supple and Sottile for De Jesus's deliberate indifference claim related to his complaints of sore throat, eye pain and vision problems. Summary judgment is denied as to Supple and Sottile for De Jesus's deliberate indifference claim related to his complaint of chronic migraine headaches.

**\*14** SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 814838

Footnotes

1   Plaintiff had originally sought also to bring claims against defendants in their official capacities as officers of the DOC, but withdrew those claims in his affirmation in opposition to the defendants' motion to dismiss filed November 16, 2009.

2   In his complaint, De Jesus also asserted claims against William Connolly, Superintendent of Fishkill; Lester Wright, Chief Medical Officer of the DOC; and Dr. Ramasree Karri, a psychiatrist who treated plaintiff. De Jesus voluntarily dismissed the claims against these defendants in his opposition to the defendants' motion to dismiss.

3   Plaintiff complains that defendants did not submit a statement of material facts as to which there is no genuine dispute pursuant to the Southern District's Local Rule 56.1. Because the defendants' motion to dismiss was converted into one for summary judgment, however, they were not required to file such a statement. *See Schnur v. CTC Commc'ns Corp. Grp. Disability Plan,* 621 F.Supp.2d 96, 101 (S.D.N.Y.2008).

4   The Supreme Court's decision in *Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), which found that a supervisor can be held liable only "through the official's own individual actions", *id.* at 1948, arguably casts doubt on the continued viability of some of the categories set forth in *Hastings on Hudson.See Qasem v. Toro,* No. 09 Civ. 8361(HHS), 2010 WL 3156031, at *3 (S.D.N.Y. Aug.10, 2010) ("The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability ...."). For the purposes of this case, however, it is not necessary to explore this issue, because Albright, Maume and Williams were not supervisors of the defendants primarily responsible for the alleged violation.

5   Even if they had been voting members of the IGRC that had denied De Jesus's grievances, under Second Circuit law, it is "questionable" whether a denial of an inmate's grievance constitutes sufficient personal involvement to make him liable. *McKenna v. Wright,* 386 F.3d 432, 437–38 (2d Cir.2004) (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) (dismissing claim against superintendent whose involvement was limited to denying grievance regarding inadequate medical care)).

6   De Jesus attempts to characterize Supple's alleged opinion that his ailments had a psychological root as an "opinion (belief)" because Supple is not a psychotherapist, and that this "opinion" does not deserve the same kind of deference as a "diagnosis" Supple would make as a medical doctor. Plaintiff provides no support for why this particular opinion, if in fact it was held by Supple, would not be a professional medical opinion or less deserving of deference by non-medical personnel.

7   In his medical records, De Jesus first complained of headaches in July 2007, but they were not mentioned in his medical records once he arrived at Fishkill until March 28, 2008. After that date, his reports of headaches were not as consistent as his complaints of sore throat and eye pain, but his medical records show that he told medical staff that he was experiencing migraine headaches in July, September, October and December 2008, and January 2009.

8   Although De Jesus was referred to OMH in July 2008, defendants do not argue that this referral was made to address De Jesus's complaints of headaches. The documents produced by defendants indicate that the purpose of the referral was to determine if there was a psychological root of De Jesus's eye pain and vision problems.

9   Although Sottile stated in his declaration that "efforts have been made to reduce" De Jesus's migraine headaches, the only pain relieving medications he mentioned were "Ibuprofen, Motrin, Imitrex ." De Jesus's records indicate that Imitrex was not prescribed until January 2009. Ibuprofen—the generic name for Motrin and the term used in his prescription chart

—was prescribed by a Dr. Williams in fall 2008 for pain associated with dental issues, including wisdom tooth extraction and toothaches. There is no evidence of ibuprofen being prescribed for the purpose of treating De Jesus's headaches before January 2009.

10  De Jesus also presented several affidavits to support his contention that the subjective element was satisfied, at least in part, by Supple's allegedly rude behavior or hostility towards him. As defendants argue at length in their reply memorandum, rude behavior has never been found to be sufficient to make a defendant liable for deliberate indifference. *See Smith v. Goord,* No. 9:08 Civ. 1364 (NAM/RFT), 2010 WL 3488148, at *6 (N.D.N.Y. Aug.9, 2010) ("[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983.") (citation omitted). This evidence, therefore, does not need to be factored into the analysis here at all. De Jesus has sufficiently shown that there is a genuine dispute precluding summary judgment without any affidavits concerning Supple's attitude or allegedly insensitive statements. Indeed, De Jesus made no allegations that Sottile acted in anything but a professional manner, yet summary judgment is also precluded on the claim against him.

---

**End of Document**                                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1488405
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gregory GATES, Plaintiff,

v.

Glenn GOORD; Lester Write; Wayne Strack;
John Doe; R. Kirkatrict; St. Agnes Hospital;
William Walsh; John Doe; Wayne Barkley;
H. Klages; T. Hunter; Dr. Sass; G. Bhat; Dr.
Loinaz; G. Stinson; D. Artuz; R. Broaddu; Floyd
Bennet; A. White; A. Rabideau; R. Doane;
Hans Walker; Gregory Matthew; Anthony
Graeffo; C. Coyne; Dr. Kooi; John Sheridan; K.
Torobley; Dr. Holloway; B. Lucas; J. Richard;
K. Fleury; Karen McDonald, Defendants.

No. 99 Civ. 1378(PKC).   |   July 1, 2004.

### MEMORANDUM AND ORDER

CASTEL, J.

**\*1** Plaintiff Gregory Gates, a former inmate in the New
York State Department of Corrections ("DOCS"), brought
this action in February, 1999, alleging that DOCS officials
violated his rights under the First, Eighth, and Fourteenth
amendments of the U.S. Constitution. As a result of a
previous motion to dismiss discussed below, the only claims
that remain are those alleging Eighth Amendment violations
relating to medical treatment while Gates was incarcerated
in DOCS facilities. Defendants move for summary judgment
against these claims pursuant to Rule 56, Fed.R.Civ.P. For
the reasons explained below, defendants' motion is granted in
part and denied in part.

### Background

After dismissal of the entire Complaint for failure to state
a claim, Gates filed an Amended Complaint in July, 2000
("AC") alleging constitutional violations, pursuant to 42
U.S.C. § 1983. In a Report and Recommendation ("R &
R") dated August 29, 2001, Magistrate Judge Frank Maas
recommended to Judge Richard Berman, to whom this case
was then assigned, that significant portions of the Amended
Complaint be dismissed. No objections were filed to the R &

R and Judge Berman adopted it in full. The R & R concluded
that all but eight of the defendants should be dismissed from
the action, and that damages from those eight defendants were
unavailable for actions taken in their official capacities. (R &
R at 25) In total, the R & R dismissed 27 defendants, including
two John Does, and dismissed in their entirety Gates's claims
alleging unlawful retaliation.

The remaining allegations implicate Gates's claim that
defendants are liable for Eighth Amendment violations,
stemming from their alleged deliberate indifference to his
medical needs. Gates claims that while walking across the
Fishkill Correctional Facility's ("Fishkill") recreational area,
he slipped on a large patch of ice. (AC ¶ 37) He alleges that
his fall was due to Fishkill's negligence. (AC ¶ 79) Upon
subsequent arrival to St. Agnes Hospital, Gates contends
that he was told that he had a break in his fibula. (AC ¶
39) A metal plate was attached to the fibula, and Gates
was informed that he would receive follow-up treatment,
including treatment for ligament tears. (AC ¶¶ 41-42) He
claims that he subsequently received inadequate medical
treatment, and felt "constant excruciating pain" as a result.
(AC ¶ 43) Gates was thereafter transferred from the Fishkill
facility to the Riverview Correctional Facility ("Riverview"),
which he claims was done in an attempt to prevent him from
asking questions concerning his ligament damage, and as an
effort to conceal Fishkill's negligence. (AC ¶ 79) Gates claims
that, although he was transferred from the Fishkill facility, a
hold should have been placed to prevent such transfer amid
his continuing medical treatments. (AC ¶ 79) "A pattern
emerged that clearly shows that Plaintiff was moved from
facility to facility to deny Plaintiff his rights to proper medical
care."(AC ¶ 79)

**\*2** Gates also alleges facts specific to each of the defendants.
He contends that Strack, the superintendent at Fishkill, was
aware of Gates's fall on the ice; that Strack received all
of Gates's DOCS grievances; and that Strack transferred
him in order to conceal Fishkill's liability. (AC ¶ 48) Gates
alleges that Loinaz, a physician who attended to him after
his transfer from Fishkill to Riverview, failed to provide
follow-up medical treatment. (AC ¶ 57) He alleges that
Stinson, an official at Riverview, circulated a memorandum
containing false information about what medical supplies had
been provided to Gates. (AC ¶ 58) When Gates was later
transferred to the Auburn Correctional Facility ("Auburn"),
he claims, Walker failed to fulfill promises that he would tend
to his medical needs. (AC ¶ 65) Gates alleges that Matthew,
a physician at the Auburn facility, failed to provide him

sufficient medical treatment. (AC ¶ 66) Kooi, also a physician at the Auburn facility, allegedly told plaintiff that nothing was wrong with him, and instructed him to leave his office without examination. (AC ¶ 69) He alleges that Coyne "failed to take appropriate action's" [sic] despite being "repeatedly" notified of his medical problems. (AC ¶ 68)

Defendants Coyne, Strack, Loinaz, Stinson, Walker, Matthew, Stinson, and Kooi bring this motion pursuant to Rule 56(c), Fed.R.Civ.P., arguing that Gates (1) has not established deliberate indifference by the defendants; (2) has not shown personal involvement by defendants Strack, Walker, Coyne, and Stinson; and (3) cannot defeat defendants' defense of qualified immunity. (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def.Mem.") at 2)

Defendants also move for summary judgment dismissing Gates's retaliatory transfer claim, arguing that Gates failed to administratively exhaust this claim. However, it is clear from Judge Maas's R & R, and Judge Berman's subsequent adoption thereof, that the retaliatory transfer claims already have been dismissed from this litigation. (R & R at 19 ("Accordingly, both of the defendants named in the Fishkill Retaliation Claim should be dismissed this case."); R & R at 21 ("the Transfer Retaliation Claim should be dismissed as against all four defendants named therein.")) Because the defendants move for summary judgment on claims dismissed from this action, I do not address their arguments pertaining to administrative exhaustion and retaliatory transfer. To the extent that this argument implicates the "total exhaustion" doctrine under the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a), the retaliation claims have already been dismissed from this action for reasons unrelated to exhaustion. (R & R at 18-21) The "total exhaustion" doctrine, if valid and applicable, would require the dismissal of all claims if any claim were subject to dismissal for non-exhaustion. See,e.g.,Farid v. Ellen, 2003 WL 23018805 at *4 (S.D.N.Y. Dec. 23, 2003) (collecting cases). The Second Circuit has yet to speak on this issue. SeeOrtiz v. McBride, 02-0088 (Oral Argument, May 27, 2004). Regardless of how the Circuit rules, it would provide no comfort to defendants in this case because there would be no occasion to determine an administrative exhaustion issue pertaining to a claim dismissed on an entirely different ground earlier in the action.

### Summary Judgment Standard

**\*3** Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Rule 56(c), Fed.R.Civ.P. A fact is material if it "might affect the outcome of the suit under the governing law...."Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."Id. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995) (citation and quotation marks omitted); accordMatsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). However, when the moving party has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

### Defendant Barkley

Defendant Wayne Barkley died in January, 2002. (Defendant's Rule 56.1 Statement ("56.1") at 1 n. 1) Nothing in the docket or in the exhibits to this motion reflect that Gates has filed a motion to substitute a representative of Mr. Barkley's estate. Rule 25(a)(1), Fed.R.Civ.P. I must consider whether plaintiff was required to make such a substitution, and, if so, the effect of his failure to do so.

Rule 25(a)(1) reads in relevant part: "If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties ... Unless the motion is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed at to the deceased party."Plaintiff was formally placed on notice of Barkley's death on the first page of defendants' Rule 56.1 Statement, which was served and filed on December 24, 2003.[1] The Rule 56.1 Statement was served pursuant to Rule 5, Fed.R.Civ.P., and therefore suffices to provide Gates with proper notice of Barkley's death. More than 90 days have lapsed since the service and filing of the Rule 56.1 Statement. Dismissal therefore is appropriate.

Gates's memorandum of law and the accompanying affidavits mention Barkley's name only in passing. Plaintiff has, at no point in time, raised any opposition to the dismissal of Barkley, nor made any applications concerning the identity of Barkley's estate or a desire to make service thereon. Because Gates has not contested the notice of Barkley's death, and has not moved to substitute Barkley, Barkley is dismissed from this action. *See,cf.,Hogan v. Metromail,* 2002 WL 373245, at *1 n. 1 (S.D.N.Y. Mar. 8, 2002) (notice of plaintiff's death and substitution communicated in summary judgment brief was unopposed, and therefore accepted as valid).

### *Gates's Eighth Amendment Claims*

**\*4** Defendants move for summary judgment on the basis that Gates failed to establish defendants' deliberate indifference to his medical needs. Gates has alleged Eighth Amendment violations by defendants Matthew, Kooi and Coyne of Auburn and defendant Loinaz of Riverview.

The Second Circuit has articulated a two-pronged approach to evaluate deliberate indifference claims. The first, objective prong requires that a deprivation must be "sufficiently serious." *SeeHathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert.denied,*513 U.S. 1154, 115 S.Ct. 1108 (1995), *citingWilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991). A sufficiently serious deprivation is one that could lead to "death, degeneration, or extreme pain." *Seeid.,quotingNance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). The second, subjective prong requires that a defendant-official must have acted with a sufficiently culpable state of mind, one that rises above negligence but is "less than conduct undertaken for the very purpose of causing harm."*Id.,quotingFarmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977 (1994). To have a sufficiently culpable state of mind, a prison official must know of and disregard an "excessive risk" to inmate health and safety. *Seeid.*The official must both be aware of facts predicating an inference that a substantial risk of serious harm exists, and must also draw that inference. *Seeid* .

Defendants argue that, assuming the existence of a "sufficiently serious" deprivation, Gates cannot establish that defendants knew of and disregarded an excessive risk to Gates's health. (Def. Mem. at 10) Defendants offer a detailed record concerning Gates's history of medical treatment while incarcerated. Following the fracture of Gates's right ankle in December, 1996, he received surgical medical attention. (Singleton Decl. Ex. F, Bates Nos. 0186-0187). After surgery, Gates received follow-up medical treatment. (Singleton Decl.

Ex. F., Bates No. 0218) Once transferred to Riverview, Gates received, *inter alia,* boots for ankle support, black knee-high support stockings, a Motrin prescription for 800/mg, application of an analgesic balm, a walking cane, high-top sneakers, additional x-rays, physical therapy, whirlpool treatment, and medical consultations. (Declaration of Dr. Michael Seidman ("Seidman Decl.") ¶¶ 8-21, 23) At the Auburn Correctional Facility, Gates received advice from or was examined by the facility's medical staff on multiple occasions. The medical staff, *inter alia,* attempted to secure Gates a cane (Singleton Decl. Ex. F, Bates No. 103), attempted to secure the replacement or repair of Gates's New Balance sneakers (Singleton Decl. Ex. F, Bates No. 104), inquired into Gates's desire for medical boots, and ultimately ordered them on his behalf (Singleton Decl. Ex. F, Bates No. 104-05), and noted Gates's preference to be treated by specific medical staffers (Singleton Decl. Ex. F, Bates No. 107). Gates was incarcerated at Auburn from March 10, 1998 through April 28, 1999, and the record reflects that Gates consulted with medical staff members on 67 occasions during his stay. (56.1 ¶ 2; Singleton Decl. Ex. F, Bates Nos. 98-122) His Ambulatory Health Record while at Auburn indicates that he often communicated with or visited members of the medical staff multiple times per week, and frequently on consecutive days. (Singleton Decl. Ex. F, Bates No. 113-14) At the Bare Hill Correction Facility, medical staffers recommended that Gates use high-top sneakers (Singleton Decl. Ex. F, Bates Nos. 131, 225, 235), administered at least one x-ray to Gates's ankle (Singleton Decl. Ex. F, Bates No. 137), measured Gates for orthopedic boots (Singleton Decl. Ex. F, Bates No. 226, 244, 248), and recommended that Gates be referred to an orthopedic consultant to address his concerns. (Singleton Decl. Ex. F, Bates No. 237)

**\*5** Gates acknowledges that after his transfer to Riverview, he was treated by an orthopedic specialist, Dr. Bhat, who recommended that Gates undergo physical therapy. (Plaintiff's Mem. at 8) "When plaintiff went to see the physical therapist, plaintiff's response to the treatment involved excruciating pain, thus afterwards the therapist told him that his injuries were too serious for physical therapy to have any effect."(Plaintiff's Mem. at 8) Gates argues that his treatment was motivated by the economics of managed health care, and that doctors "conspired" with DOCS officials to prevent effective treatment of his injuries. (Plaintiff's Mem. at 8-9) Gates also argues that he was faced with a sort of Hobson's choice near the end of his prison term, wherein he was offered treatment by a specialist on the eve of his release, done with the knowledge that Gates would prefer release to

medical treatment, and that prolonged incarceration would be an inevitable result of specialist treatment. (Plaintiff's Mem. at 9) Gates argues that such conduct "should shock the conscience of the [C]ourt."(Plaintiff's Mem. at 9) [2]

Against this background, defendants argue that Gates's single encounters with defendants Kooi, Loinaz and Matthew cannot support a deliberate indifference claim. (Def. Mem. at 12). I address in turn the claims regarding each of these three defendants. In so doing, I note that Gates, who is represented by counsel, failed to provide the court with a counterstatement under Local Rule 56.1. "If the opposing party failed to controvert a fact so set forth in the moving party's Rule 56.1 Statement, that fact will be deemed admitted."*Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003). The moving part must nevertheless offer facts supporting its Rule 56.1 Statement, and must satisfy the movant's Rule 56 burden. *Seeid.*Despite Gates's omission, I have weighed the factual materials produced by plaintiff, and, required by Rule 56, draw all reasonable inferences in favor of the non-movant, Gates.

### A. *Kooi*

Defendants argue that Gates cannot show that Kooi, a physician at Auburn, treated him with deliberate indifference. (Def. Mem. at 12, citing*Hathaway*, 37 F.3d at 66) According to the Amended Complaint, Kooi's alleged failure to examine plaintiff's right lower leg and ankle constituted deliberate indifference. (AC ¶ 69) Upon Gates's arrival at Auburn, the nursing staff reviewed him in a routine examination. (Singleton Decl. Ex. F Bates No. 100; Declaration of Dr. Pang Kooi ("Kooi Decl.") ¶ 7) A subsequent appointment was arranged with Kooi. (Singleton Decl. Ex. F Bates No. 100; Kooi Decl. ¶ 7) On April 10, 1998, Gates requested a sick call, which was deferred because he was asleep at the appointed time . [3] (Singleton Decl. Ex. F Bates No. 100; Kooi Decl. ¶ 9) Kooi examined Gates on April 27, 1998, at which point he requested that Gates be evaluated by an orthopedic specialist for the possible removal of hardware in his injured ankle. (Singleton Decl. Ex. F Bates No. 101; Kooi Decl. ¶ 10) Kooi states that he had no other medical encounters with Gates, and that he believed that Gates underwent successful surgery for the removal of hardware in his right ankle. (Kooi Decl. ¶¶ 11-12)

**\*6** Neither the document captioned as an "Affirmation in Opposition" and signed by Gates's counsel, nor the affidavit proffered under Gates's name mention Kooi by

name, or dispute the facts supported in Kooi's affidavit and the defendants' exhibits. The affirmation of Gates's counsel is further flawed, inasmuch as it purports to convey facts that are outside the scope of counsel's personal knowledge, including representations regarding the types of injuries suffered by Gates and details concerning DOCS procedures. (Affirmation in Opposition ¶¶ 6-8) Such averments are insufficient to defeat summary judgment. *See,e.g.,U.S. v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir.1994) (affidavit not based on personal knowledge insufficient to create issue of fact on summary judgment motion); *Omnipoint Communications, Inc. v. Common Council of the City of Peekskill*, 202 F.Supp.2d. 210, 213 (S.D.N.Y.2002) ("An attorney's affidavit which is not based on personal knowledge of the relevant facts should be accorded no weight on a motion for summary judgment."). In any event, plaintiff's memorandum of law references no facts that meaningfully contradict Kooi's affidavit concerning Gates's treatment.

Based on the facts proffered by the defendants, including Kooi's request for a review of Gates's record by an orthopedic surgeon, there is no genuine question of material fact as to Kooi; there is no evidence to support a claim that Kooi engaged in a "sufficiently serious" deprivation of medical treatment, nor a state of mind more culpable than negligence but lesser than a purposeful intent to cause harm. *SeeHathaway*, 37 F.3d at 66. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim" of deliberate indifference. *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998); *accordOrtiz v. Makram*, 2000 WL 1876667, at \*6 (S.D.N.Y. Dec. 21, 2000) (dismissing on summary judgment plaintiff's deliberate indifference claim). So long as treatment of a prisoner is adequate, no constitutional violation will be found. *Seeid.*Kooi has come forward with no evidence to show that Kooi's treatment of the plaintiff was anything other than attentive and safely outside the bounds of conduct prohibited by the Eighth Amendment.

Plaintiff's claim against Kooi is dismissed.

### B. *Loinaz*

Regarding defendant Loinaz, defendants argue that Loinaz, a physician at Riverview, examined Gates for the first time on September 3, 1997. (56.1 ¶ 43; Declaration of Dr. Frederick Loinaz ("Loinaz Decl.") ¶ 7) The Amended Complaint alleges that Loinaz failed to provide sufficient follow-up treatment and monitoring, in disregard to plaintiff's

"excruciating pain." (AC ¶ 57) According to Loinaz, Gates complained to him of pain and stiffness in his right ankle. (Loinaz Decl. ¶ 7) Loinaz observed that there was no redness or swelling at Gates's right ankle (Singleton Decl. Ex. F ¶ 92), and he was aware that an orthopedic specialist visited Gates on July 17, 1997.[4] (Loinaz Decl. ¶ 7) Loinaz states that he was aware that the orthopedist recommended that Gates receive a new cane, knee-high stockings, and high-top sneakers. (Loinaz Decl. ¶ 7) Further, Loinaz indicates that the absence of swelling and redness, Gates's ability to ambulate, and a preexisting Ibuprofen regimen led him to advise Gates that if pain persisted, he should report back to medical officials for follow-up treatment. (Loinaz Decl. ¶ 8) Loinaz states that he did not ignore Gates's complaints or fail to examine him, and that, after the September 3 examination, he had no further medical encounters with Gates. (Loinaz Decl. ¶¶ 9-10)

**\*7** As with Kooi, neither the Affirmation in Opposition and nor the Gates Declaration mention Loinaz by name, much less dispute the facts supported in Loinaz's declaration and the defendants' exhibits. Similarly, plaintiff's memorandum of law offers nothing that would be sufficient to create an issue of fact as to Loinaz's treatment of the plaintiff. The facts produced by defendants show that Loinaz was attentive and thorough in his examination of the plaintiff, and observed an absence of any redness or swelling around plaintiff's ankle. Loinaz observed that Gates was capable of ambulating, and was aware of that Gates was consuming Ibuprofin. In light of these unchallenged assertions, there is no genuine issue of material fact: Loinaz is not responsible for any "sufficiently serious" deprivation of medical treatment, nor a state of mind more culpable than negligence but lesser than a purposeful intent to cause harm. *See* Hathaway, 37 F.3d at 66. As noted above, a difference of opinion on the proper course of treatment cannot predicate an Eighth Amendment deliberate indifference claim. *See* Chance, *supra* . Therefore, defendants' motion is granted, and Loinaz is dismissed from this action.

### C. *Matthew*

During the time period relevant to this action, Matthew had been employed at Auburn as a physician. (56.1 ¶ 9) The Complaint alleges that Matthew denied Gates medical care and footwear without examining Gates's injuries. (Complaint ¶ 66) In denying the motion to dismiss Gates's claim against Matthew, Judge Maas determined that the pleadings provided an insufficient basis for determining whether Matthew's

conduct was based on deliberate disregard of serious medical problems, or whether Gates was a malingerer who required no further treatment. (R & R at 15)

In contrast to the materials produced for Kooi and Loinaz, there are no factual submissions pertaining to Matthew's treatment of Gates. As such, the defendants fail to offer any facts that clarify or refute the allegations brought against Matthew in the Amended Complaint. Matthew is discussed in defendants' 56.1 Statement only insofar as he is identified as a physician formerly employed at Auburn.[5] (56.1 ¶ 9) He proffers no affidavit. Defendants do not cite to documentary exhibits that pertain to Matthew's treatment of the plaintiff.

As the moving party on a Rule 56 motion, defendants do not direct the Court to any facts sufficient to show that defendant Matthew is not liable for either the sufficient physical deprivation or a state of mind constituting deliberate indifference. Matthew's involvement with the medical treatment of Gates is no clearer now than it was at the Rule 12 stage. As a result, defendants' motion is denied as it pertains to Matthew.

### Gates's Claims for "Supervisory Liability"

Defendants move for summary judgment dismissing Gates's claims against defendants Walker, Coyne, Stinson, and Strack. In evaluating defendants' Rule 12 motion, the R & R determined that the Amended Complaint, interpreted liberally, stated claims against these four defendants for liability in their roles as direct or indirect supervisors of the alleged wrongdoers. (R & R at 23-24)

**\*8** In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit set forth the criteria for determining whether a defendant's involvement in a section 1983 claim is sufficient to trigger liability. In addition to direct involvement in a constitutional violation, possible grounds for liability include the following:

> A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent

in managing subordinates who caused the
unlawful condition or event.

*Id.* at 323-24 (internal citations omitted).*See also*Sealey v.
Giltner, 116 F.3d 47, 51 (2d Cir.1997) (listing same criteria).
As noted in defendants' memorandum of law and the R & R,
the doctrine of *respondeat superior* is insufficient to establish
liability on a section 1983 claim, and a defendant must
have some degree of direct personal involvement with the
wrongdoing. *See*Johnson v. Glick, 481 F.2d 1028, 1034 (2d
Cir.1973) (Friendly, J.), *overruled on other grounds,*Graham
v. Connor, 490 U.S. 386, 394-95, 109 S.Ct. 1865, 1870-71
(1989). I address in turn Gates's remaining claims asserting
supervisory liability.

### A. *Walker*

Defendant Walker was employed by DOCS from August,
1964 to October, 2001. (56.1 ¶ 7; Declaration of Hans Walker
("Walker Decl.") ¶ 1) During the period relevant to this
litigation, he was superintendent at Auburn. (56.1 ¶ 7; Walker
Decl. ¶ 1) The Amended Complaint alleges that Gates wrote
to Walker regarding his medical problems. (AC ¶ 65) It
claims that Gates had "many face to face conversations" with
Walker, who gave Gates "repeated assurances" that he would
speak to Auburn's doctors to ensure that Gates would be
treated. (AC ¶ 65) Gates alleges that Walker never spoke with
doctors on his behalf. (AC ¶ 65)

As part of his responsibilities as superintendent, Walker
states, he annually received approximately 3,000 letters or
complaints from inmates, 900 of which included complaints
about Auburn's medical staff. (56.1 ¶ 75; Walker Decl. ¶
6) According to Walker, the volume of inmate complaints
prevented him from personally investigating or familiarizing
himself with each complaint. (56.1 ¶ 75; Walker Decl. ¶ 6) He
delegated complaints to deputy superintendents to investigate
inmate allegations and respond. (56.1 ¶ 76; Walker Decl. ¶
7) Complaints raising medical issues were directed to doctors
or to the facility health services director, Walker states, all
of whom responded directly to inmate complaints. (56.1 ¶
76; Walker Decl. ¶ 7) Walker confirms that he received
a letter of complaint dated September 29, 1998, in which
Gates complained that the medical staff was not providing
adequate follow-up treatment. (56.1 ¶ 77; Walker Decl. ¶
8; Singleton Decl. Ex. F, Bates Nos. 35-36) He recalls no
personal conversations with Gates. (Walker Decl. ¶ 12)

**\*9** According to Walker, he forwarded the complaint to
First Deputy Superintendent Gary Hodges on the same day.
(56.1 ¶ 77; Walker Decl. ¶ 8; *attached at* Singleton Decl. Ex.
F Bates No. 37) Walker included instructions that Hodges
was to investigate and handle directly; reply on Walker's
behalf; and forward a copy of the reply to Walker. (56.1
¶ 77; Walker Decl. ¶ 8; Singleton Decl. Ex. F Bates No.
37) On October 5, 1998, Hodges forwarded a reply to
Gates. Copied to Walker, the entire text of the reply stated:
"Your request to see a bone specialist has been approved
and an appointment date has been confirmed."(56.1 ¶ 78;
Singleton Decl. Ex. M) Walker states that he had no reason to
question Hodges's investigation, and that he knew Hodges to
thoroughly investigate inmate complaints. (56.1 ¶ 79; Walker
Decl. ¶ 9-10)

As Judge Koeltl observed in *Amaker v. Goord,* 2002 WL
523371, at *16 (S.D.N.Y. Mar. 29, 2002), certain DOCS
officials receive thousands of inmate letters each year, which
are then forwarded to appropriate personnel for further
investigation. Such a circumstance will not support a finding
of liability or personal knowledge on the part of the letters'
recipient. *See*id.*Accord*Greenwaldt v. Coughlin, 1995 WL
232736 at *4 (S.D.N.Y. Apr. 19, 1995) (Preska, J.) ("[I]t is
well-established that an allegation that an official ignored a
prisoner's letter of protest and request for an investigation of
allegations made therein is insufficient to hold that official
liable for the alleged violations.").

Walker's sworn declaration, in combination with the
documentary evidence produced by defendants, is sufficient
to negate any liability to Gates under a theory of supervisory
liability. Gates offers no facts pertaining to Walker's
involvement with any alleged Eighth Amendment violations
he suffered. Indeed, Gates states that "through discovery
and trial, plaintiff would ascertain the exact involvement"
that Walker played in Gates's treatment. This contention,
even if construed under Rule 56(f), fails to defeat summary
judgment. As directed by Judge Berman, discovery in this
five-year-old action closed on August 29, 2003, roughly
five months before plaintiff filed opposition papers. (Docket
Entry # 92) Neither plaintiff's memorandum of law nor the
accompanying declarations refutes the averments contained
in defendants' submissions, which reflect that Walker
delegated investigative responsibilities to another DOCS
official, and that Gates's complaint was one of thousands that
arose annually. Gates offers no statements in opposition that
raise a genuine question of material fact. Indeed, his argument
appears to be based on a fundamental misunderstanding of

the role of a summary judgment motion, and the standard required in its opposition. As such, I grant defendant Walker's motion for summary judgment dismissing Gates's claim against him.

## B. *Strack*

Defendant Strack was employed by DOCS from September, 1964 through September, 1999. (56.1 ¶ 6; Declaration of Wayne Strack ("Strack Decl.") ¶ 1) During the time period relevant to this litigation, Strack served as superintendent at Fishkill. (56.1 ¶ 6; Strack Decl. ¶ 1) The Amended Complaint states that Gates personally informed Strack of his need for medical treatment. (AC ¶ 48) In addition to allegations no longer included in this action, plaintiff claims that Strack "should have known that the Plaintiff would experience great pain(s) as a result of having Plaintiff's right ankle shackled with Plaintiff was being transferred to Riverview Correctional Facility."(AC ¶ 48)

**\*10** As superintendent, Strack received approximately 2,000 letters or complaints per year from the facility's inmates. (56.1 ¶ 21; Strack Decl. ¶ 6) Strack contends that approximately 200 of those complaints implicated Fishkill's medical staff. (56.1 ¶ 21; Strack Decl. ¶ 6) According to Strack, the volume of complaints precluded him from personally investigating or reviewing every inmate letter. (Strack Decl. ¶ 6) Strack delegated to deputy superintendents the responsibility to investigate and respond to inmate complaints. (Strack Decl. ¶¶ 7-8) All complaints regarding medical services were forwarded to the director of the facility health services, a doctor who "would conduct thorough investigations into inmates' complaints."(Strack Decl. ¶¶ 7-8) Strack states that, to his knowledge, his deputies conducted "thorough routine investigations into inmates' complaints."(Strack Decl. ¶ 8) According to Strack's secretary, who maintained a log of inmate complaints, Gates filed two complaints-one on December 19, 1996, and one on March 31, 1997. (Declaration of Kristin Woodward ¶¶ 4-6)

Based on the facts offered by defendants and the holdings of *Amaker,* 2002 WL 523371, at *16, and *Greenwalt,* 1995 WL 2327236, at *4 (S.D.N.Y. Apr. 19, 1995), I conclude that Strack has satisfied his burden on this motion. Plaintiff offers no facts pertaining to Strack's involvement with any alleged Eighth Amendment violations. Indeed, he states that "through discovery and trial, plaintiff would ascertain the exact involvement" Strack played in Gates's treatment. This contention, even if construed under Rule 56(f), fails to defeat summary judgment. As directed by

Judge Berman, discovery in this five-year-old action closed on August 29, 2003, roughly five months before plaintiff filed his opposition papers. (Docket Entry # 92) Neither Gates's memorandum of law nor the accompanying declarations refute the averments contained in defendants' submissions, which reflect that Strack delegated certain responsibilities to other DOCS officials, and that Gates's complaints were two among thousands considered by the administration that Strack headed. Gates points nothing that supports a finding of "supervisory liability" on Strack's part. I grant defendant Strack's motion for summary judgment dismissing Gates's claim against him.

## C. *Coyne*

From January, 1989 thru May, 2002, defendant Coyne served as Nurse Administrator at Auburn. (Declaration of Christine Coyne ("Coyne Decl.") ¶ 1) According to Coyne, her position required her to maintain the quality of the nursing practice in the correctional facility. (Coyne Decl. ¶ 2) The Amended Complaint alleges that Coyne "was notified repeatedly by the Plaintiff of said Plaintiff's medical problems yet failed to take appropriate action[ ]." (AC ¶ 68) It offers no further specifics about Coyne's actions or knowledge.

Prior to being transferred to Auburn, Gates wrote to a DOCS Chief Medical Officer about the alleged denial of follow-up medical care; the complaint ultimately was forwarded to Coyne for review. (56.1 ¶ 50; Singleton Dec. Ex. F at Bates Nos. 31-33) Coyne received this complaint in April 1998, at which point she reviewed portions of Gates's medical record. (56.1 ¶ 51; Coyne Decl. ¶ 7) Coyne concluded that Gates received appropriate follow-up care, and had been evaluated on four occasions by orthopedic specialists between January and July, 1997. (56.1 ¶ 51; Coyne Decl. ¶ 7) She also observed that Gates received physical therapy sessions, and that upon his discharge from physical therapy, was capable of ambulating independently with the aid of crutches. (56.1 ¶ 51; Coyne Decl. ¶ 7) Gates resumed physical therapy in July and August, 1997, and was thereafter placed on an independent exercise program. (56.1 ¶ 52; Coyne Decl. ¶ 8) "I noted that the nursing staff at Riverview had already scheduled an appointment for Mr. Gates to be assessed by a medical health care provider for an orthopedic follow up consult," Coyne states. (Coyne Decl. ¶ 8) After Coyne's investigation of Gates's treatment, she forwarded her findings to Nurse Administrator Betty Prendergast. (56.1 ¶ 52; Coyne Decl. ¶ 8; Singleton Decl. Ex. F, Bates Nos. 22, 33, 99-101)

**\*11** Coyne states that she later became involved in attempting to arrange Gates's appointment with an orthopedic specialist "for possible hardware removal." (56.1 ¶ 66; Coyne Decl. ¶ 9) Following "several phone calls," Coyne "eventually obtained approval for Mr. Gates to be seen at the orthopedic clinic at University Hospital, in Syracuse, New York."(56.1 ¶ 66; Coyne Decl. ¶ 10) Coyne spoke with the orthopedic surgeon, who "assured" her that the hardware removal surgery would be performed. (56.1 ¶ 66; Coyne Decl. ¶ 10) Coyne states that to her knowledge, Gates underwent successful hardware removal surgery on November 28, 1998. [6] (Coyne Decl. ¶ 10) According to Coyne, she had no further involvement with Gates's case, had no medical encounters with him, and lacked the authority to issue medical permits for items such as special boots, high-top sneakers, stockings, or canes. (56.1 ¶ 73; Coyne Decl. ¶¶ 11-12)

As with other defendants who Gates sues under the theory of supervisory liability, plaintiff offers no facts pertaining to Coyne's involvement with any alleged Eighth Amendment violations he suffered. Gates states that "through discovery and trial, plaintiff would ascertain the exact involvement" Coyne played in Gates's treatment. This contention, even if construed under Rule 56(f), fails to defeat summary judgment. As noted above, discovery has been closed for several months. Neither plaintiff's memorandum of law nor the accompanying declarations refute the averments contained in defendants' submissions, which reflect that Coyne undertook a diligent review of Gates's medical treatment, and actively worked on Gates's behalf in obtaining consultation with a specialist. Gates offers no fact or legal argument that supports a finding of "supervisory liability" on Coyne's part. I grant defendant Coyne's motion for summary judgment dismissing Gates's claim against her.

### D. Stinson

During the time period relevant to the complaint, defendant Stinson was employed at Riverview as a deputy superintendent of security. (56.1 ¶ 8) At the request of former Riverview superintendent Wayne Barkley, Stinson responded to Gates's medical complaints. (56.1 ¶ 47) On March 25, September 19, and October 23, 1997, Stinson conducted an investigation into Gates's medical complaints. (56.1 ¶ 47) Following each of these investigations, Stinson wrote Gates concluding that Gates received treatment for his injuries. (56.1 ¶ 47) Stinson concluded that Gates had been evaluated by three physicians, received radiographic studies, learned

that films revealed a healed fracture in Gates's right ankle and received permits for special boots, a bottom bunk, and a cane. (56.1 ¶ 47; Singleton Decl. Ex. F. at Bates Nos. 19, 22, 26)

The Amended Complaint alleges that Stinson issued a memorandum containing false information about medical supplies issued to Gates. (AC ¶ 58) In moving for summary judgment, defendants have not produced facts sufficient to show the veracity of Stinson's memoranda, either via affidavit or other support. Defendants direct the Court to a portion of Gates's deposition in which he acknowledges receiving a pair of Wolverine boots while at Riverview, and that he was also given a pair of high-top sneakers. (See Singleton Decl. Ex. E at 100, 109-10) Although plaintiff proffers no opposing facts or arguments showing that Stinson should be liable under a theory of supervisory liability, neither does Stinson carry his burden of showing that there are no genuine issues of material fact as to his liability. He produces three memos that he authored, without any averments to their accuracy or the methods used to compose them. As the movant for summary judgment, the burden lies with the defendant. Standing alone, I do not consider the Stinson memoranda as a sufficient basis on which to grant summary judgment.

**\*12** Stinson's motion for summary judgment is denied. [7]

### Qualified Immunity for Matthew and Stinson

Defendants argue that they are shielded by the doctrine of qualified immunity. "Government officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."*Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 1699 (1999). The Supreme Court has adopted a two-part inquiry to determine whether an official is entitled to qualified immunity: First, the court determines whether the facts alleged show that the official's conduct violated a constitutional right; second, the Court determines whether the constitutional right at issue was clearly established at the time the violation occurred. *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001). The Second Circuit has developed an additional test for evaluating the second prong of the qualified immunity standard: a defendant is entitled to qualified immunity when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not

violate such law."*Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002) (citation omitted).

The Supreme Court has noted the difficulties imposed upon government officials when immunity is not established at the summary judgment stage, and observed that broad-ranging inquiries into official actions "can be peculiarly disruptive of effective government."*SeeHarlow v. Fitzgerald,* 457 U.S. 800, 816-18, 102 S.Ct. 2727, 2737-38 (1982)."The qualified immunity analysis depends upon an individualized determination of the misconduct alleged."*Poe,* 282 F.3d at 134. At the Rule 12 stage, Magistrate Judge Maas's R & R ruled that the qualified immunity defense presented an issue of fact that could not be resolved as part of the defendants' motion to dismiss. In this motion, defendants have done little to advance their argument past the Rule 12 stage. It is defendants' "burden at summary judgment to show the nonexistence of a clearly established right and [their] entitlement to qualified immunity."*Palmer v. Richards,* 364 F.3d 60, 67 (2d Cir.2004).

Defendants have produced no factual evidence as to Matthew's and Stinson's entitlement to qualified immunity. As determined in the preceding discussion, defendants have not met their burden of showing that their conduct did not violate a constitutional right. Defendants have offered no evidence that it was objectively reasonable for them to believe that their alleged actions did not violate clearly established law. It is axiomatic that deliberate indifference to prisoner medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment. *See,e.g.,Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.") (citation omitted). Stinson offers no facts to negate the possibility that, pursuant to *Williams,* he was directly involved in any possible violation. Similarly, if Matthew knowingly ignored any affliction that struck Gates, therein causing "the unnecessary and wanton infliction of pain contrary to contemporary standards of decency,"*Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993), he acted in violation of clearly established law. Under the second prong of *Poe,* defendants have not produced any evidence that supports a finding that their actions did not violate clearly established law. As with the rest of this motion, Gates's submissions are utterly silent as to the factual

circumstances surrounding his treatment at the hands of Matthew and Stinson. Even so, defendants' failure to produce facts concerning plaintiff's allegations against Matthew, and their production of three memoranda authored by Stinson, are insufficient grounds for a grant of qualified immunity and a dismissal of Gates's claims.

**\*13** As the Second Circuit stated in *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001), "summary judgment only is 'appropriate' when the moving party has met its burden of production under Fed.R.Civ.P. 56(c) 'to show initially the absence of a genuine issue concerning any material fact," ' *quotingAdickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1608 (1970). Defendants' submissions are silent to such basic issues as whether Matthew ever treated or diagnosed Gates, the methods underlying Stinson's investigation of Gates's complaint, and even whether Stinson's report had a basis in fact. In short, Matthew and Stinson have provided the Court with no relevant facts upon which to ground a qualified immunity analysis.

Without more, I conclude that Matthew and Stinson have failed to demonstrate an entitlement to the relief that they seek and their motion for summary judgment on the grounds of qualified immunity is denied.

### Conclusion

Defendants' motion is GRANTED as to defendant Buckley, who is dismissed pursuant to Rule 25(a)(1).

Defendants' motion for summary judgment is GRANTED as to defendants Coyne, Strack, Loinaz, Walker, and Kooi.

Defendants' motion is DENIED as to defendants Matthew and Stinson.

I direct the parties to attend a final pretrial conference to be held on July 15, 2004, at 11 a.m. in Courtroom 12C, 500 Pearl Street, New York, NY.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2004 WL 1488405

Footnotes

1   The docket reflects that the Rule 56.1 Statement was filed on December 24, 2003, although the Statement itself is dated November 12, 2003.

2   Plaintiff confuses the standards used in Rule 12 and Rule 56 motions in arguing that "[i]t is implicit in the Judge's [Rule 12] order that there is a triable issue of fact as to the defendants [sic] personal involvement named above since he dismissed the claims against many other defendants named in the plaintiff's original complaint but he decided not to grant dismissal against the remaining defendants."(Plaintiff's Mem. at 4) A motion under Rule 12 addresses only the sufficiency of allegations, and not whether there is factual support for them.

3   In his memorandum of law, Gates disputes that he missed an appointment due to sleep. (Plaintiff's Mem. at 10-11) Kooi's representation is supported not only by affidavit, but also by contemporaneous documentary evidence. In contrast, Gates's memorandum of law cites to no supporting evidence.

4   That orthopedist, identified as G. Bhat, M.D. (56.1 ¶ 43) was dismissed from this action at the Rule 12 stage. (R & R at 11-12)

5   Other averments refer to a "Nurse Matthews" at Riverview who administered the drug Motrin and an analgesic balm to the plaintiff. (56.1 ¶ 30; Seidman Decl. ¶ 10) I make no assumption as to whether "Nurse Matthews" is the same person identified as defendant Gregory Matthew, M.D., of the Auburn facility.

6   Defendants' Rule 56.1 Statement ¶ 70 indicates that the removal surgery occurred on November 25, 1998, *citing* Singleton Decl., Ex. F at Bates Nos. 110, 211.I do not consider that discrepancy to be material to the resolution of this motion.

7   "Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."*Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999). With defendant Loinaz dismissed from the case, Gates has no remaining claims implicating events at Riverview, with the exception of this supervisory liability claim against Stinson. *Clarke v. Sweeney,* 312 F.Supp.2d 277, 298 (D.Conn.2004), held that a claim for supervisory liability could not stand in a section 1983 action after the court determined that there was no underlying constitutional violation. Stinson has not argued that this is a basis for granting his motion, and preliminary research did not yield any precedent in the Eighth Amendment context. Because defendants do not raise this argument, much less offer any facts that would strengthen it, I do not consider it at this time.

---

   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 21507345
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Bernard PATTERSON, Plaintiff,

v.

Sharon LILLEY, Wladyslaw Sidorowicz, Ginger
Eggler, and William Brown, Defendants.

No. 02 Civ.6056 NRB.    |    June 30, 2003.

Prisoner brought federal civil rights suit against prison
intake nurse, prison doctor, and two supervisors, alleging
deliberate indifference to his asthmatic condition. Defendants
moved to dismiss complaint for failure to state claim. The
District Court, Buchwald, J., held that: (1) prisoner's asthma
was not sufficiently serious to require care immediately
upon his arrival at prison; (2) intake nurse was not
deliberately indifferent to prisoner's medical needs; (3)
prisoner's preference for treatment by particular doctor and
his disagreements concerning method of treatment did not
show deliberate indifference to his medical needs; (4) prison
doctor's alleged remark about effect of budgetary constraints
on treatment did not give rise to claim under facts; and (5)
supervisors were not liable for alleged Eighth Amendment
violations.

Motion granted.

West Headnotes (7)

[1]     **Prisons**
          🔑 Particular Conditions and Treatments

        **Sentencing and Punishment**
          🔑 Medical care and treatment

        Prisoner's asthmatic condition was not
        sufficiently serious to give rise to Eighth
        Amendment violation when intake nurse
        informed prisoner at midnight that he would
        have to wait to following morning to receive
        medication; prisoner did not allege any
        discomfort at time or experience any symptoms
        of emergent attack. U.S.C.A. Const.Amend. 8.

10 Cases that cite this headnote

[2]     **Prisons**
          🔑 Particular Conditions and Treatments

        **Sentencing and Punishment**
          🔑 Medical care and treatment

        Prison nurse was not deliberately indifferent
        to prisoner's serious medical needs in violation
        of Eighth Amendment when she informed
        him, during intake to prison, that he would
        have to wait until morning to be evaluated
        for asthma medications; nothing suggested
        that nurse acted with requisite mental state
        of criminal recklessness, where prisoner was
        not experiencing discomfort at time or
        any symptoms of emergent attack. U.S.C.A.
        Const.Amend. 8.

9 Cases that cite this headnote

[3]     **Prisons**
          🔑 Particular Conditions and Treatments

        **Sentencing and Punishment**
          🔑 Medical care and treatment

        Prisoner's preference for examination by
        particular physician did not prove deliberate
        indifference to his serious medical needs, in
        violation of Eighth Amendment, where he did
        receive medical treatment between his arrival at
        facility and examination by physician of choice.
        U.S.C.A. Const.Amend. 8.

5 Cases that cite this headnote

[4]     **Prisons**
          🔑 Particular Conditions and Treatments

        **Sentencing and Punishment**
          🔑 Medical care and treatment

        Prisoner's disagreements with method in which
        his asthma was treated, including lowering
        medication dosage, changing medications, and
        for some period, taking him entirely off
        medication, involved mere difference of opinion,
        rather than deliberate indifference to his serious
        medical needs and thus could not violate Eighth
        Amendment. U.S.C.A. Const.Amend. 8.

5 Cases that cite this headnote

3 Cases that cite this headnote

**[5]** **Sentencing and Punishment**

    Medical care and treatment

Any alleged negligence on part of prison physician in treating prisoner did not rise to level of Eighth Amendment violation merely because patient was prisoner. U.S.C.A. Const.Amend. 8.

1 Cases that cite this headnote

**[6]** **Prisons**

    Particular Conditions and Treatments

**Prisons**

    Health and medical care

**Sentencing and Punishment**

    Medical care and treatment

Prison physician's alleged remark concerning possible effect of budgetary constraints on treatment for prisoner's asthma was insufficient to create Eighth Amendment violation; there was no withholding of treatment contemporaneous to remark, and prisoner did not suffer any attacks as result of later elimination of asthma medications. U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

**[7]** **Civil Rights**

    Criminal law enforcement; prisons

**Prisons**

    Particular Conditions and Treatments

**Sentencing and Punishment**

    Medical care and treatment

Alleged failure of nurse administrator and another prison supervisor to act on prisoner's information about alleged indifference to his medical needs did not violate Eighth Amendment; supervisors were not personally involved in prisoner's medical treatment, no unconstitutional custom or practice was implicated, supervisory officials were not grossly negligent, and there was no underlying violation by medical personnel. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Mr. Bernard Patterson, Green Haven Correctional Facility, Stormville, New York, for Plaintiff.

Kimberly A. Dasse, Assistant Attorney General, New York, New York, for Defendant.

## MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** Plaintiff Bernard Patterson ("plaintiff"), currently incarcerated in Central New York Psychiatric Center's satellite unit at Green Haven Correctional Facility, brings this action *prose* against the following health care workers and staff members of Sullivan Correctional Facility, where plaintiff was formerly imprisoned: Nurse Ginger Eggler; Dr. Wladyslaw Sidorowicz; Nurse Administrator Sharon Lilley; and Deputy of Administrative Services William Brown (collectively, "defendants"). Plaintiff brings suit under 42 U.S.C. § 1983, alleging that defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution by their deliberate indifference to his medical care. Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted and pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction due to a failure to exhaust administrative remedies required by the Prison Litigation Reform Act. 42 U.S.C. § 1197e(a). For the reasons that follow, the defendants' motion to dismiss for failure to state a claim is granted. [1]

## *BACKGROUND* [2]

Plaintiff alleges that on December 19, 2001, at approximately twelve o'clock midnight, he arrived at Sullivan Correctional Facility ("Sullivan"). Upon arrival, he advised the processing officer that he was an asthmatic and had not received his medication for that day. The processing officer notified the nurse of plaintiff's condition. Shortly thereafter, the processing officer returned and informed plaintiff that Nurse

Ginger Eggler said plaintiff would have to wait until morning to be seen by anyone. Plaintiff was then escorted to a housing unit without being screened for medical or mental disorders and without receiving any asthma medication.

The following morning, December 20, 2001, at approximately 8:20 a .m., plaintiff maintains he suffered an asthma attack. Plaintiff was examined at the facility clinic, given breathing treatment, and provided oral medication. He was advised he would be called to the clinic to pick up his asthma medication that evening, but was never called. The following morning, plaintiff reported to the facility clinic to inquire why he had not been called to pick up his medication. Plaintiff avers he was informed that the doctor had lowered the dosage of his medication. Plaintiff inquired as to why his dosage had been lowered without a personal consultation by a doctor. Plaintiff does not state what the response was to this inquiry.

Plaintiff claims that because the dosage had been lowered, and because he was never evaluated properly, he suffered five additional asthma attacks on January 6, 9, 11, 13, and 14, 2002. However, plaintiff does not allege that he sought treatment at the infirmary for any of the attacks in January. Nonetheless, on January 14, 2002, plaintiff was examined by Dr. Wladyslaw Sidorowicz. During this examination, Dr. Sidorowicz put plaintiff on a different medication and further advised plaintiff to let him know if the new medication did not work and he would change it. Plaintiff also alleges that during this same examination, Dr. Sidorowicz told him that he intended to stop plaintiff's asthma medication in an effort to keep the budget down.

 **\*2**  On February 21, 2002, plaintiff alleges that he was placed in the infirmary as a result of inadequate medical treatment for his asthma, but he does not describe the reasons for his admission to the infirmary, the treatment he received, or when he was discharged. Plaintiff claims that on March 8, 2002, he informed a nurse that the new medication was not working and requested to be placed back on his original asthma medication. Several days later, on March 11, plaintiff maintains he reported to sick call and was told by a nurse that she had, in fact, spoken with Dr. Sidorowicz about his asthma medication, and that the doctor had decided to discontinue the medication because it was not working and chose not to prescribe anything in its place. Plaintiff suffered no additional asthma attacks.

Although the precise timing is unclear, plaintiff claims he wrote a letter to Nurse Administrator ("N.A.") Sharon Lilley explaining his unhappiness with the treatment he was receiving for his asthma. In her response letter, plaintiff claims N.A. Lilley justified Nurse Eggler's screening upon his initial intake at Sullivan and Dr. Sidorowicz's decision to discontinue his medication. Plaintiff also claims he wrote a letter to Deputy of Administrative Services William Brown. Plaintiff does not describe the contents of his own letter, only that Deputy Brown advised plaintiff that his medication had been changed to a better regime with more effective medication. Plaintiff further avers that in a later letter from Deputy Brown, he was advised that "testing at this facility does not support your self diagnosis of asthma."

Plaintiff claims that as a result of the mental duress caused by this situation, he chose to cut his right forearm with a shaving razor on March 25, 2002. Plaintiff further avers that Dr. Sidorowicz initially refused to send him to an outside hospital to treat the wound, but that after being pressured by the mental health staff, the doctor sent him to an outside medical center where he received twenty stitches. Thereafter, on April 3, 2002, Dr. Sidorowicz placed plaintiff back on his original asthma medication.

Plaintiff herein has four complaints: (1) Nurse Eggler denied plaintiff his asthma medication upon his initial intake at Sullivan and did not properly screen him, such that if he were properly screened, he would not have been given a shaving razor due to his mental disorder; (2) Dr. Sidorowicz did not properly treat and failed to examine him earlier than January 14, 2002, and that prior thereto, plaintiff suffered six asthma attacks; (3) N.A. Lilley failed to act on the content of the plaintiff's complaint letter; and (4) Deputy Brown, a non-medical professional, should not have given a medical opinion in response to plaintiff's complaint letter, and failed to remedy the inadequate medical care of which plaintiff complained.

Plaintiff filed suit on August 23, 2002. He moved to have counsel assigned, which we denied on October 10, 2002. Defendants moved to dismiss on November 22, 2002.

### *DISCUSSION*

### I. Motion to Dismiss Standard
 **\*3**  A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of a complaint and should be

granted "only if it is clear that no relief could be granted under any set of facts consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (*citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In this context, our function is "merely to assess the legal feasibility of the complaint, not to assay the legal feasibility of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). We acknowledge, towards this end, the well-settled principle that the movant bears the burden of persuasion and that the nonmovant's well-pleaded factual allegations must be accepted as true. *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). Moreover, a complaint submitted *pro se* must be liberally construed and is held to a less rigorous standard of review than formal pleadings drafted by an attorney. *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Salahuddin v. Coughlin,* 781 F.2d 24, 28 (2d Cir.1986).

## II. Eighth Amendment Standard

In an action brought under 42 U.S.C. § 1983, the plaintiff must establish that a person acting under color of state law deprived him of a federal constitutional right. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Here, plaintiff claims that defendants Nurse Eggler and Dr. Sidorowicz violated his Eighth Amendment rights by failing to provide him with proper medical care, and that defendants N.A. Lilley and Deputy Brown violated his Eighth Amendment rights by failing to properly address his complaints regarding such inadequate care.

The Eighth Amendment, made applicable to the states by the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishment." *See Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (holding that the Eighth Amendment is applicable to treatment and conditions of confinement for prison inmates). We are additionally mindful of the state's constitutional obligation to provide inmates with adequate medical care. *See Id.* at 832. Indeed, it is well-established that a prison official's denial of access to medical care or interference with prescribed treatment may constitute the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977). To state a cognizable claim under § 1983 for inadequate medical care, an inmate must allege acts or omissions sufficiently harmful to evidence "deliberate indifference" to his serious medical needs. *Estelle,* 429 U.S. at 104. As such, the plaintiff must allege conduct that

is "an unnecessary and wanton infliction of pain," or that is "repugnant to the conscience of mankind." *Id.* at 105–06.

The deliberate indifference standard "embodies both an objective and subjective prong" and the plaintiff must satisfy both prongs in order to establish that prison officials unconstitutionally deprived him of adequate medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert.denied,subnom.Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). First, the inmate's medical condition must be, in objective terms, "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A condition is "sufficiently serious" under the Eighth Amendment if it is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66 (citing *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). Second, the charged official must act with a sufficiently culpable state of mind. *See Wilson,* 501 U.S. at 298. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66 (citing *Farmer,* 511 U.S. at 835–36). More specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

## III. Evaluation of Plaintiff's Claims

**\*4** Having set forth the two-part standard for deliberate indifference, we now consider whether plaintiff's allegations satisfy both the objective and subjective prongs with regard to each individual defendant.

### A. Nurse Eggler

**[1]** Plaintiff claims that upon his intake at Sullivan he was denied his asthma medication by Nurse Eggler and was not properly screened for mental disorders. Assuming the truth of these allegations and viewed in the light most favorable to the plaintiff, they do not amount to a constitutional deprivation as they meet neither the objective nor subjective elements of the deliberate indifference standard.

At the time of Nurse Eggler's involvement, around midnight on December 19, 2001, she was informed only that plaintiff was an asthmatic and that he desired his medication. Plaintiff

did not allege any discomfort or any symptoms of an emergent attack. Thus, plaintiff does not satisfy the objective component of a deliberate indifference claim. More than minor discomfort or injury is required for plaintiff to meet the objective prong of demonstrating a "sufficiently serious" medical need.

Being an asthmatic (a person susceptible to asthma attacks) is not a condition, in Eighth Amendment parlance, that is severe or "sufficiently serious." The existence of the condition is distinct from the situation in which an inmate is suffering an actual attack. Cf.*Ennis v. Davies,* No. 87 Civ. 1465, 1990 WL 121527 (S.D.N.Y. Aug.15, 1990) (denying a motion for summary judgment based on prison official's refusal to provide an inmate his asthma medication during an actual attack). Indeed, in *Sulkowska v. City of New York,* 129 F.Supp.2d 274 (S.D.N.Y.2001), where plaintiff was denied her asthma medication while a detainee in police custody, the court found that such conduct amounted to no more than mere negligence, not deliberate medical indifference, as asthma was not sufficiently serious to warrant Eighth Amendment protection in the absence of an attack or symptoms of an attack. [3] *Id.* at 292.

**[2]** Plaintiff's allegations concerning Nurse Eggler also fail to meet the subjective prong of the indifference claim. Plaintiff does not provide facts sufficient to find that Nurse Eggler acted with the requisite mental state of criminal recklessness. *SeeHennings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). As noted, plaintiff never complained to Nurse Eggler of any pain, discomfort, or any condition that was "fast-degenerating" or "life-threatening." Nurse Eggler did not refuse to treat plaintiff altogether, but merely informed plaintiff when he arrived at midnight that he would have to wait until morning to be evaluated. Assuming that these allegations amount to negligent treatment, they are insufficient to state a claim for deliberate indifference, and plaintiff has not alleged any denial of care in the face of needed medical attention that would suggest a higher level of culpability. *SeeEstelle,* 429 U.S. at 106 (holding that a negligent diagnosis is not enough to meet the subjective test). Plaintiff's perspective that something more should have been done in light of his medical condition is not sufficient basis for a deliberate indifference claim. *SeeChance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

**\*5** Accordingly, as plaintiff has failed to plead that Nurse Eggler was deliberately indifferent to a serious medical need

of his, he has failed to state a claim against her for which relief may granted.

**B. Dr. Sidorowicz**

**[3]** Plaintiff makes a variety of claims against Dr. Sidorowicz. First, plaintiff contends that Dr. Sidorowicz did not personally examine him until January 14. However, even plaintiff's own complaint establishes that he did receive medical treatment between his arrival at the facility and his examination by Dr. Sidorowicz, and moreover, that a doctor was involved in that period of treatment. The record is unclear as to whether it was Dr. Sidorowicz or another physician who was involved in plaintiff's treatment before January 14. Indeed, plaintiff does not allege that any serious medical event between his arrival and January 14 (the date of his last alleged attacked) was knowingly untreated by health officials. Furthermore, on January 14, Dr. Sidorowicz did treat plaintiff. The Eighth Amendment requires that there not be deliberate indifference to a prisoner's serious medical needs, but not that a prisoner receive unfettered access to the medical care of his choice. *Alston v. Howard,* 925 F.Supp. 1034 (S.D.N.Y.1996)."Plaintiff's preference for an examination by a physician does not sustain a claim for denial of medical assistance. 'There is no right to the medical treatment of one's choice if the prescribed treatment is based upon applicable medical standards.'" *Reyes v. Turner,* No. 93 Civ. 8951, 1996 WL 93728, at *2 (S.D.N.Y. Mar.5, 1996) (quoting *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988).

**[4]** Plaintiff also raises issues relating to the treatment of his asthma that involved changing his medication, lowering the dosage, and for some period, taking him off of his medication entirely. These complaints are properly characterized as a difference of opinion—plaintiff's desired treatment versus Dr. Sidorowicz's medical judgment—rather than deliberate indifference. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."*Chance,* 143 F.3d at 703; *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). In fact, "so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."*Id.* The government must provide medical care for its prisoners, *Estelle,* 429 U.S. at 103, but "the prisoner's right is to medical care—not to the type or scope of medical care which he personally desires." *Linden v. Westchester County,* No. 93 Civ. 8373, 1995 WL 686742, at *3 (S.D.N.Y. Nov.20, 1995) (quoting *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970)). In fact, plaintiff's allegations,

rather than reflecting indifference, reflect attention and include Dr. Sidorowicz's telling statement to plaintiff to let the doctor know if the medication was not effective so it could be changed.

**\*6** **[5]** At worst, plaintiff's allegations against Dr. Sidorowicz amount to negligence or medical malpractice. Even if we assume those conclusions *arguendo,* plaintiff's claim must still fail because a "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."*Estelle,* 429 U.S. at 105–06; *Hathaway,* 99 F.3d at 553; *Farmer,* 511 U.S. at 837;*seealsoVento v. Lord,* No. 96 Civ. 6169, 1997 WL 431410, at \*4 (S.D.N.Y. July 31, 1997) ("[D]isagreement with the defendants' diagnoses and dissatisfaction with the treatment of her medical condition [are] allegations which are not actionable under the Eighth Amendment."). Further, allegations of negligence, medical malpractice, or errors in professional judgment are insufficient to sustain an Eighth Amendment claim. *SeeZimmerman v. Macomber,* No. 95 Civ. 0882, 2001 WL 946383 (S.D.N.Y. Aug.21, 2001); *seealsoGill v. Mooney,* 824 F.2d 192 (2d Cir.1987). It is also clear that medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle,* 429 U.S. at 106.

**[6]** Finally, we comment on one particular aspect of plaintiff's allegations, namely, the remark attributed to Dr. Sidorowicz concerning the possible effect of budgetary constraints on plaintiff's treatment. First, based on plaintiff's own allegations, there was no withholding of treatment contemporaneous to the alleged remark. Second, even when plaintiff was taken off his asthma medication weeks later, he did not suffer any attacks. Furthermore, it should be noted that consideration of cost factors in choosing a course of treatment of a prisoner is, in and of itself, no more violative of a prisoner's constitutional rights than is, for example, the consideration of the cost of providing prescription drug coverage to non-incarcerated recipients of Medicare.

## C. N.A. Lilley and Deputy Brown

**[7]** Plaintiff asserts that he wrote letters complaining about his medical treatment to both N.A. Lilley and Deputy Brown. Plaintiff claims that N.A. Lilley failed to properly address the problems outlined in his complaint letter to her and that Deputy Brown improperly offered a medical opinion in his response to plaintiff's complaint letter to him. Plaintiff asserts N.A. Lilley wrote a response to him in support of

the course of treatment plaintiff was receiving from Dr. Sidorowicz and the behavior of Nurse Eggler. In Deputy Brown's alleged response to plaintiff, he justified the medical regime implemented by Dr. Sidorowicz. Neither defendant, based on these facts alleged in plaintiff's complaint, can be said to have violated plaintiff's constitutional rights in any manner.

It is well-established that liability for damages under § 1983 may not be based on the *respondeatsuperior* or vicarious liability doctrines. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Koehl v. Dalsheim,* No. 94 Civ. 3351, 1995 WL 331905, at \*2 (S.D.N.Y. June 5, 1995). The mere fact that a defendant occupies a position of authority will not merit the imposition of § 1983 liability. *SeeAl Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). A supervisor is not liable for civil rights violations committed by his subordinates;[4] to recover damages in a § 1983 claim, a plaintiff must demonstrate that the defendants were personally involved in the alleged wrongdoing. *Id; McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (holding that defendants' personal involvement is a prerequisite to recovery of damages under § 1983, since the doctrine of *respondeatsuperior* does not apply), *cert. denied,*434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Personal involvement of a supervisory official within the meaning of § 1983 may be established through: (1) direct participation in a constitutional wrong; (2) failure to remedy a known wrong; (3) creation of an unconstitutional practice or custom; or (4) gross negligence in managing subordinates who have caused the violation. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986); *Candeleria v. Coughlin,* 787 F.Supp. 368, 372 (S.D.N.Y.), *aff'd,*979 F.2d 845 (2d Cir.1992). Plaintiff's complaint fails to meet any of the four circumstances recognized.

**\*7** Plaintiff does not present any facts to suggest that the supervisory defendants were personally responsible for the alleged denial of medical care or in the alleged deprivation of plaintiff's rights. No unconstitutional practice or custom was created nor were the supervisory defendants grossly negligent in managing their subordinates. Moreover, as we find no underlying constitutional violations were committed by Nurse Eggler or Dr. Sidorowicz, N.A. Lilley's and Deputy Brown's alleged failure to act on information concerning such alleged violations does not support liability under § 1983.[5]

### CONCLUSION

A *prose* complaint can only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Even applying these liberal standards, plaintiff's claims against each of the defendants is not cognizable under § 1983. Accordingly, we conclude that plaintiff's allegations of deliberate indifference to his medical needs fail to state a claim upon which relief can be granted. Defendants' motion to dismiss is granted.

Pursuant to 28 U.S.C. § 1915(a)(3), it is hereby certified that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of the Court is hereby requested to close this case on the Court's docket.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21507345

Footnotes

1    While the parties dispute whether the plaintiff has exhausted all of his claims, the defendants concede that he exhausted at least some of his administrative remedies, and as we dismiss the complaint on the merits, we need not resolve the exhaustion issue.

2    Unless otherwise noted, all facts are taken from plaintiff's complaint.

3    In contrast to the response at the time of plaintiff's midnight arrival, he received medical care the next morning when he had an attack. Nurse Eggler's conduct should be examined only in the context of plaintiff's condition at the time of his arrival at the facility. Nurse Eggler could only be held deliberately indifferent to an existing, serious medical condition, not a speculative, future medical injury. The requisite culpable state of mind would necessarily be absent for the unknown, future injury. Plaintiff's allegation that he cut his arm three months after arriving at Sullivan because he was not initially screened for mental disorders by Nurse Eggler (without making any indication or notification of such a disorder) also fails for this reason.

4    We are assuming only for purposes of this decision that the relationship of supervisor/subordinate exists between the relevant actors.

5    Defendants argue additionally that they are not individually liable under § 1983 because they are entitled to qualified immunity. Because we dismiss plaintiff's claims on the merits, it is unnecessary to address this issue.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.